**FISHER BAKING COMPANY, a Utah corporation, Plaintiff,**

v.

**CONTINENTAL BAKING CORPORATION, a Delaware corporation, General Baking Company, a New York corporation, Eddy Bakeries Company, Inc., a Delaware corporation, and Royal Baking Company, a Utah corporation, Defendants.**

No. C 145–64.

United States District Court
D. Utah,
Central Division.

Feb. 12, 1965.

Clifford L. Ashton, and Richard W. Giauque, of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for plaintiff, Fisher Baking Co.

Peter W. Billings, of Fabian & Clendenin, Salt Lake City, Utah, and John H. Schafer, of Covington & Burling, Washington, D. C., for defendant Continental Baking Co.

C. E. Henderson and Donald E. Holbrook, of Ray, Rawlins, Jones & Henderson, Salt Lake City, Utah, and William J. Manning and Arthur I. Settles, of Simpson, Thacher & Bartlett, New York City, for defendants General Baking Co., Eddy Bakeries Co., Inc., and Royal Baking Co.

CHRISTENSEN, District Judge.

In this antitrust suit,[1] the defendant General Baking Company, a New York corporation,[2] has moved for a dismissal

1. Plaintiff claims damages under Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2, and Section 2(a) and (d) of the Clayton Act as amended by the Rob-

inson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a) and (d).

2. Usually referred to herein as "General".

of the complaint for lack of venue and for the quashing of service of process, upon the ground that it was not an inhabitant of, or found or transacting business within, the District of Utah.[3]

Attention is presently focused upon the dividing line between Cannon Manufacturing Company v. Cudahy Packing Company, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925); cf. Velandra v. Regie Nationale Des Usines Renault, 336 F.2d 292 (6th Cir.1964), and Intermountain Ford Tractor Sales Company v. Massey-Ferguson Ltd., 210 F.Supp. 930 (D.C. Utah 1962); cf. Curtis Publishing Company v. Cassell, 302 F.2d 132 (10th Cir. 1962); Able v. Albina Engine and Machine Works, 284 F.2d 510 (10th Cir. 1960); Focht v. Southwestern Skyways, Inc., 220 F.Supp. 441 (D.C.Colo.1963), and Fooshee v. Interstate Vending Company, 234 F.Supp. 44 (D.C.Kan.1964). That there is such a determinative line is apparent, unless the Cudahy doctrine is to be wiped out, or ignored, which is not within the province of a district court. We have concluded that defendant General Baking Company's contacts within the District of Utah through its subsidiaries Eddy Bakeries Company, Inc.,[4] and Royal Baking Company,[5] fall on the Cudahy side of the line and thus that Fisher Baking Company has not established venue or personal jurisdiction over the parent corporation.

The plaintiff contends that General Baking Company has sufficient direct contacts with Utah and exerts sufficient control, both indirectly and directly, over the Utah operations of Eddy and Royal as to subject it to suit in this forum. General maintains that its contacts in Utah are fragmentary and are entirely consistent with and in the course of its permissible interest as a parent company in subsidiaries, and that such control as it exercises over its subsidiaries inheres in the very relationship which Cudahy teaches does not subject it to venue or jurisdiction in the local forum.

The court finds:

1. General is a New York corporation with its principal place of business in New York City. It is engaged in the manufacture and sale of bakery products in the States of California, Connecticut, Kansas, Kentucky, Louisiana, Massachusetts, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Virginia, Washington, and West Virginia, and in the District of Columbia under the brand names "Bond", "Van de Kamp's", and other brands.

2. General's Eddy is a Delaware corporation with principal place of business in Helena, Montana. It is engaged in the manufacture and sale of bakery products in the States of Idaho, Minnesota, Montana, North Dakota, Washington and Wisconsin under the brand names "Eddy's", "Olympic Meal", and other brands.

3. Royal, a wholly-owned subsidiary of Eddy, is a Utah corporation with its principal place of business in Ogden, Utah. It is engaged in the manufacture and sale of bakery products in the State of Utah, and the sale of such products in portions of the States of Nevada and Wyoming under the brand names "Royal", "Eddy's", and other brands.

4. General has never been licensed to do business in Utah. It has never owned any real or personal property or maintained any bank account in Utah, nor has its name appeared in any telephone book or business directory in Utah. It has never sold, solicited orders for, advertised or shipped its bakery products into Utah. It has never licensed either Eddy or Royal or any other entity to manufacture or sell products under any of its brand names in the State of Utah.

5. Prior to December, 1957, neither General nor any of its subsidiaries had any connection whatever with the State of Utah. In December, 1957, General formed Eddy (then known as Northwest Bakeries Company, Inc.) as its wholly-owned subsidiary for the purpose of ac-

3. Section 12 of Clayton Act, 15 U.S.C. § 22.

4. Usually referred to as Eddy here.

5. Usually here referred to as Royal.

quiring a chain of bakeries theretofore owned and operated by Eddy Bakeries, Inc. and its affiliates, which were controlled by J. E. O'Connell. Eddy has been licensed to do business in Utah since its organization, although neither it nor any subsidiary of General engaged in a regular course of business in Utah until Royal began operations in March, 1962.

6. Since its acquisition in December, 1957, by General as a subsidiary, Eddy has operated substantially as Eddy Bakeries, Inc. had operated theretofore. The same bakeries at the same locations produced the same products and sold them under the same brand names in the same territories. The office of Eddy remained in Helena, Montana. The officers of Eddy Bakeries, Inc., became Eddy's officers, and continued to exercise substantially the same authority and responsibilities, without consultation with or direction from General, in regard to operating matters such as determining what products were to be sold, the markets in which they were to be sold, prices, advertising, purchase of raw materials, banking connections, credit and collections, selection of attorneys and accountants, labor relations and collective bargaining, and capital improvements, as they had prior to the formation of Eddy and its acquisition of the bakeries involved.

7. No officer or director of General became or has ever become an officer of Eddy, although some officers and directors of General became directors of Eddy. Of the eleven initial directors of Eddy, only four had any prior connection with General, while seven had previously been associated with Eddy Bakeries, Inc. During the time period covered by the complaint the directors of Eddy have been: J. E. O'Connell, Joseph J. McVey, Philip J. Dietzen, James O'Connell, R. J. Hug (resigned June 7, 1964), George L. Morrison (resigned June 5, 1961), Lloyd C. Mitchell (ceased to be a General director on February 7, 1962 and died on June 16, 1964), L. H. Fortin, A. T. Hibbard, Trevor S. Povah, Hugh Galusha, Jr. (resigned on January 1, 1963), Kenneth R. Smith (became director on June 5, 1961), and Gordon R. Ball (became director on June 7, 1964). Of these, only Hug, Morrison, Mitchell, Fortin and Ball had been directors of General prior to their election to the Eddy board. The directors of Royal were J. E. O'Connell, Joseph J. McVey, Philip J. Dietzen, Marjorie Trainor, and R. J. Hug until June 7, 1964, when A. T. Hibbard replaced Mr. Hug as a director. All of these but Hug were originally associated with Eddy rather than General.

8. The officers of Eddy are J. E. O'Connell, Chairman of the Board and Chief Executive Officer, Joseph J. McVey, President, Philip J. Deitzen, Vice-President, James O'Connell, Vice-President, and Marjorie Trainor, Secretary-Treasurer. Since the acquisition, each of these officers, except for Marjorie Trainor, has assumed executive positions with General. J. E. O'Connell has been a director of General since January 8, 1958. He was a member of General's Management Committee between October 15, 1958 and November 19, 1960, and a member of General's Executive Committee from April 12, 1962 to the present, having been Chairman of that Committee until September 25, 1963. He was General's interim President and Chief Executive Officer from June 3, 1964 to October 21, 1964, and has been the Chairman of General's Board of Directors since June 3, 1964. Joseph J. McVey became a Vice-President and a director of General on September 2, 1964.

9. When this action was commenced on July 29, 1964, the same individual, J. E. O'Connell, was chairman of the Board of Directors and Chief Executive Officer of defendant General Baking, and Eddy, and a director of Royal Baking Company. As a member of the Executive Committee he possessed greater operational authority than many of the other officers of General since the bylaws of General specify that all of the officers of the company were subordinate in authority to the Executive Committee.

10. In addition, J. E. O'Connell, Joseph J. McVey, Philip J. Dietzen and

James O'Connell have been officers of General's Eddy Bond (now Midwest) Division since the summer of 1962. This division, like each of General's other divisions, is completely divorced from the operation of Eddy. It operates in different territories and sells different products. Unlike the operation of Eddy, the division is subject to direction and control from General's headquarters in New York with respect to such matters as placement of insurance, internal audit, approval of capital improvements, selection of attorneys, changes in brand names, product line, payment of taxes, selection of advertising, labor relations, leases, and selection of banking connections.

11. Since the acquisition Eddy, as General's wholly-owned subsidiary, has been subject to whatever degree of control General chose to exercise. General's charter and by-laws, however, do not delagate or channel authority for supervising Eddy, so that the power of control ultimately resides in General's Board of Directors. General's Board of Directors has not delegated to any officer or to its Executive Committee any authority over Eddy. General's Board of Directors does not exercise any control over the day to day operations of Eddy. General's Board of Directors (or the Executive Committee thereof) has limited the exercise of its authority over Eddy to such matters as receiving reports on Eddy's operations; receiving summaries of the minutes of the meetings of Eddy's stockholders and Board of Directors; approving certain Eddy leases in which J. E. O'Connell has had a personal interest; approving some major purchases by Eddy of real property; approving the purchase of bakeries (including Royal) by Eddy from Capri, Inc., a company in which J. E. O'Connell has a personal interest; setting J. E. O'Connell's salary and, on one occasion, approving increases of salaries of certain other key Eddy officers; including certain Eddy officers in stock option, bonus, and retirement annuity plans, and once recommending a plan of recapitalization which would, if

adopted, have resulted in the merger of Eddy into General, which plan was rejected by General's shareholders. Except for such matters, corporate separation has been scrupulously observed, and as to all matters, including overall planning of the parent corporation, separate corporate channels and mechanisms appear generally to have been observed although on some major decisions when access to General's board was not immediately available direct contact has been had with General's officers.

12. Eddy and Royal are completely separate corporations from General. They have their own separate articles of incorporation, by-laws, directors, officers, books of account, bank accounts and operating employees. The formal corporate separateness of Eddy and Royal from General has not been substantially disregarded in practice. General has not attempted to avoid the normal operational consequences of the parent-subsidiary relationship and has not exercised its power to direct the detailed activities of Eddy or of Royal.

13. J. E. O'Connell received a salary which in 1962 was $50,000.00 per year, $24,000.00 of which was charged to Eddy operations and $26,000.00 of which was charged to General Baking. The home office administrative expenses of General Baking Company are apportioned to "all of the major operating divisions of the company", including Eddy which is charged one-eighth of one percent of its sales to cover this home office expense.

14. There was substantial communication between the New York home offices of General and J. E. O'Connell in Helena, Montana, and there was substantial communication between the New York home office and personnel of Eddy and its subsidiary, Sage Advertising, in Helena, and also substantial inter-corporate telephonic communication between other management personnel of the parent company and the subsidiaries.

15. Through financial statements, other reports, audits and general supervision by officers of General as to financial records and reporting, the parent com-

pany is kept closely informed of the operations of Eddy.

16. All non-union salaried Eddy personnel including the plant manager and five other employees at Ogden, Utah, are covered by the General Baking retirement annuity pension plan. Similarly the management personnel of Eddy, including those in the State of Utah, are covered by management bonus incentive plans of General Baking. But there is no indication that the details of this common coverage are incompatible with the separate entities of the respective corporations or that the separation of the companies has been substantially disregarded in these respects.

17. Sage Advertising Company, a wholly owned subsidiary of Eddy, does all the advertising work for Eddy and all of the other units of General Baking, excepting the Van de Kamp division. Ingredients and supplies for both the Eddy plants and certain General Baking plants are centrally purchased from the Helena, Montana office. Detailed proposals regarding purchasing operations have been communicated to Helena from the General Baking offices in New York City.

18. Eddy is frequently referred to both on the Eddy letterhead and otherwise as a division of General Baking. General in its corporate records has referred to the Eddy Plant in the State of Utah as its plant. In the General's annual reports for 1962 and 1963, the Ogden, Utah, baking plant has been listed as one of the plants operated by General Baking and General Baking reports refer to the Salt Lake City—Ogden, Utah, marketing area as part of the market coverage of General.

19. Except for the foregoing inter-organizational contact and coordination, and particularly with regard to its day by day operations, Eddy has operated as a separate corporate entity and the separate corporate forms were meticulously observed. In general the interchange of information, personnel and reports and the other inter-organizational contact were of a nature that might be expected between parent and subsidiary, and seem-

ed designed to effectuate that relationship rather than to accomplish any merger of activities.

20. It is further found that most of the inter-organizational activity involved the main Helena office of Eddy and not any Utah activity directly, so that in the absence of such inter-mixture of activities as might justify piercing the corporate veil the claimed doing of business in Utah, as distinguished from Montana, on the part of the parent company, would depend upon an especially limited field of activity.

In reaching a conclusion as to the inferences reasonably to be drawn from the findings of fact, the court cannot close its eye to the real relationship between most parent corporations and their subsidiaries, notwithstanding the outward forms that relationship may take. Under the rationale of Cudahy and by reason of the realities of corporate relationships which the Supreme Court has indicated did not involve an impermissible mixture, a parent company doesn't have to be insulated from any influence, information or reports concerning the operations of its subsidiary. The two corporations do not have to live in two entirely business worlds as the price of their recognition as separate entities. By the same token, it is within the realities of the situation that officers of a subsidiary can be sensitive to the policies of the parent company and do not have to ignore, reject or defy the parent company in order to afford the semblance or substance of separate corporate existences. Thus Cudahy teaches that interlocking directorates or officers do not destroy the separation.

We agree largely with the view expressed in Valandra v. Nationale Des Usines Renault, supra, that the existence or non-existence of the necessary "minimum contact" to justify the upholding of personal jurisdiction over foreign corporations under the fourteenth amendment as interpreted in the case of International Shoe Company v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), as under the standards estab-

lished by the antitrust laws, must be worked out with reference to the facts of a particular case rather than on a statement of dogmatic rules or all inclusive principles. However, this agreement is tempered by the realization that any freedom of subjective judgment in a particular case in view of Cudahy may not be at variance with, and repugnant to, the very existence of parent and subsidiary corporations as separate entities. Any applications which would tend to work that ultimate result must be examined critically as long as the established law remains as now declared by the Supreme Court.

So here. The marshalling of a plethora of inter-organization detail the items of which, separately considered, are entirely consistent with the informational and policy control to be expected between parent and subsidiary, does not render necessarily invidious a relationship which remains characteristic of the one to be expected between parent and subsidiary. If it did, jurisdiction and venue might depend not upon the essential relationship between the two organizations, but upon the indefatigability of counsel in ferreting out each detail, and counsel have been most diligent here. It may be true, as is indicated in Focht v. Southwestern Skyways, Inc., 220 F.Supp. 441 (D.C.Colo.1963), that it is not merely a matter of the frequency of contacts with the forum, but it is also the extent of control that a corporation exerts in a state by means of devices such as a distributor agreement or, as might be added, parental supervision. But in the case at bar we do not have a depth of activity much different than that which has always been regarded as natural and permissible between parent and subsidiary. In this respect Focht v. Southwestern Skyways, Inc., supra, is clearly distinguishable. Judge Brown in Fooshee v. Interstate Vending Company, supra, concluded that the contacts shown there were too strong to be explained away as mere inter-organization convenience. And indeed this appeared so, for in addition to the usual inter-corporate interest

to be expected, the details of the local business were attended to in a substantial and continuing degree by the foreign corporation.

In sharp contrast with the facts in Intermountain Ford Tractor Sales Company v. Massey-Ferguson Ltd., 210 F. Supp. 930 (D.C.Utah 1962), aff. per curiam 325 F.2d 713, (10th Cir.1963), cert. den. 377 U.S. 931, 84 S.Ct. 1334, 12 L. Ed.2d 296 (1964), here the existence of the local company as a distinct corporate entity was in all major respects observed; the local company was neither an agent nor a mere dummy of the parent corporation; there was little more than domination of the local company through the stock ownership of the parent company and the inter-organizational activity to render that effective, and there was no substantial local activity of the parent company inconsistent with its status as a parent company. "Congress has not provided that a corporation of one state shall be amenable to suit in the federal court for another state in which the plaintiff resides, whenever it employs a subsidiary corporation as the instrumentality for doing business therein." Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 334, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925). It was pointed out in the latter case that the identity of interest may have been more complete and the exercise of control over the subsidiary more intimate than in previous cases cited in the opinion, "but that fact has, in the absence of an applicable statute, no legal significance".

Peterson v. Chicago R. I. & P. R. Co., 205 U.S. 364, 27 S.Ct. 513, 51 L.Ed. 841 (1907), cited in Cudahy, disposes of the plaintiff's contention that the representation by the parent company that the subsidiary is a part or division of its system is significant to show presence in the state through the subsidiary. In Peterson the parent railroad in its annual reports referred to the "consolidation (which) permits the properties in question to be operated by one management * * * " and repeatedly asserted and advised that the subsidiary constituted

part of its "system". The contention made by plaintiff that similar representations by General demonstrate that General is doing business in Utah must be rejected.

Peterson also minimizes the importance of common directors and officers to our problems. In that case the subsidiary had thirteen members on its board of directors and eight members on its executive committee. Eleven of the members of its board of directors were also members of the parent company's board, and five of the members of the executive committee of the subsidiary were on the six member finance committee of the parent company. The officers of the parent company, with two exceptions, were also officers of the subsidiary, and a majority of the officers of either were common to both.

Prior to Cudahy it was held that the jurisdiction taken of foreign corporations in the absence of statutory requirements or express consent may not rest upon a fiction of constructive presence through the subsidiary. "It flows from the fact that the corporation itself does business in the state or district in such a manner and to such an extent that its actual presence there is established". Bank of America v. Whitney Cent. Nat. Bank, 261 U.S. 171, 43 S.Ct. 311, 67 L.Ed. 594 (1923). It has been substantially 45 years since the decision in Cudahy was filed. While the context of the principles therein stated may change both in respect to the circumstances of cases and the statutes involved, its controlling effect I think will remain in this case until we are prepared to say that there may be constructive presence of a parent through a subsidiary by reason of that mere relationship and its natural concomitants. That may some day be said, but it seems more appropriate that Congress having accepted Cudahy for so long in the antitrust context should say it, or at the very least the Supreme Court.[6]

The motions of General to quash service and to dismiss the complaint for lack of venue as to it are granted.

6. In denying plaintiff's motion for reconsideration of this decision on March 10, 1965 I stated, among other things:

"Thus, we are brought back to the core of plaintiff's position that I have heretofore ruled upon and which I cannot see now in any different light. United States v. Scophony Corporation, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948), has not changed the established rule with respect to subsidiaries as I view it, for Scophony did not give any weight to common management, did not consider that the foreign corporation was transacting business locally because of the activities of any local corporation, but held that there was a pervasive and continuing transaction of business directly by the parent.

"It may well be that 15 U.S.C. § 22, providing that a suit against a corporation under the anti-trust laws may be brought in any district wherein the corporation may be found or transacts business, should be amended to provide that such suit also may be brought in the district wherein a corporate defendant has a subsidiary, or controls a subsidiary in reality, even though not in form, by stock ownership, actual influence as a parent corporation, through common officers, or otherwise. As I indicated during the discussion in open court it is my view that in actuality all wholly owned subsidiaries are under the substantial control of the parent company in one way or another and it should not be a differentiating circumstance that the control is exercised by common officers or by other means consistent with the separate corporate structures, the facts of Cudahy being consistent and those of Massey-Ferguson inconsistent with such separation. It may be that Congress should consider the reality of parent control apart from structure in one way or another in amending § 22. The legislative problem however, is not properly before this court."