FLANK OIL CO., a corporation, doing business as Oriental Refining Co., Plaintiff,

v.

CONTINENTAL OIL CO., a Delaware corporation, Standard Oil Co. (Indiana), a corporation, American Oil Co., a corporation, Gulf Oil Corp., a Pennsylvania corporation, Standard Oil Co. (New Jersey), a corporation, and Humble Oil & Refining Co., a corporation, Defendants.

Civ. A. No. 8883.

United States District Court
D. Colorado.

Dec. 12, 1967.

Creamer & Creamer, George Louis Creamer, Denver, Colo., for plaintiff.

Holland & Hart, J. G. Holland, W. C. McClearn, and Gordon G. Greiner, Denver, Colo., for defendant Standard Oil Co. (New Jersey).

## SUBSTITUTED MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

This is a private antitrust suit under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, alleging that sundry defendants have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 2(a), (c), (d), (e) and (f) of the Clayton Act as amended by the Robinson-Patman Price Discrimination Act, 15 U.S.C. § 13(a), (c), (d), (e) and (f). The plaintiff is seeking to enjoin further alleged violations and recover treble damages.

The matter now before the court is defendant Standard Oil of New Jersey's motion to quash service of process and to dismiss the complaint for lack of jurisdiction and venue.[1] A ruling on the motion requires construction of Section 12 of the Clayton Act, 15 U.S.C. § 22, which section prescribes the tests for venue and service of process on corporations in antitrust suits:

"Any suit, action, or proceeding under the antitrust laws against a cor-

---

1. The motion also requests the court to vacate its order authorizing extraterritorial service on Standard; since we find that service of process within Colorado was adequate, there is no necessity for reaching this question.

poration may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be *found or transacts business;* and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be *found."* [Emphasis added]

The issue of jurisdiction resolves itself into a question of whether venue is properly laid in this district (i. e., whether the defendant "transacts business" in Colorado), and the issue of adequate and proper service turns on whether the defendant is "found" in Colorado. Standard Oil of New Jersey (herein called "Standard") contends that it is neither "transacting business" nor "found" in Colorado.

The plaintiff ("Flank") contends that Standard is amenable to both jurisdiction and process in this district because of its close relationship with its wholly-owned subsidiary, Humble Oil & Refining Company ("Humble"), which is admittedly "transacting business" and "found" in Colorado. Flank, in reliance upon this contention, served process on Standard by serving an agent of Humble in Colorado.

The distinction between "transacting business" and "found" in Section 12 is an artless one, which has created some difficulties in judicial interpretation. See Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Intermountain Ford Tractor Sales Co. v. Massey-Ferguson Limited, 210 F.Supp. 930 (D.Utah 1962). The legislative history clearly indicates that the addition of the phrase "transacts business" to the venue clause was intended to broaden the old requirement that a corporation must be "found" in a district before venue was proper. Similarly, it is clear that Congress, by its failure to add this broader wording to the service-of-process clause, intended to carry forward pre-existing law, so that in some situations service in a district might be invalid, even though venue in the district is established. Eastman Kodak Co. v.

Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); 1 Moore's Federal Practice (2d ed.) 1670–71. However, even though it is clear that some distinction does exist between the venue and service requirements of Section 12, the nature and meaning of that distinction is somewhat of a mystery. A number of courts have held that "transacting business" is a looser and broader concept than "doing business" under other statutes, while the word "found" is essentially equivalent to "doing business." See, e. g., Fooshee v. Interstate Vending Co., 234 F.Supp. 44 (D.Kan.1964); Goldlawr, Inc. v. Shubert, 169 F.Supp. 677 (E.D.Pa.1958); Riss & Co. v. Association of American Railroads, D.C., 24 F.R.D. 7. At least one court has held that "transacting business" is the same as "doing business" under the general venue section, 28 U.S.C. § 1391. Alex Friedman v. United States Trunk Co., 204 F.Supp. 366 (S.D.N.Y.1962). A number of courts have recognized the distinction, but at the same time have refused to find it crucial in deciding concrete cases. United States v. Scophony Corporation of America, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948); Fooshee v. Interstate Vending Co., 234 F.Supp. 44 (D.Kan.1964); Intermountain Ford Tractor Co. v. Massey-Ferguson Limited, 210 F.Supp. 930 (D.Utah 1962), aff'd per curiam 325 F.2d 713 (10th Cir. 1963), cert. den. 377 U.S. 931, 84 S.Ct. 1334, 12 L.Ed.2d 296 (1964). We have also concluded that the distinction between "transacting business" and "found" is not crucial in this case, and that Jersey Standard's contacts with Colorado are legally sufficient to support both venue and service within the district.

The facts which we find important in arriving at this result are as follows. Standard is no longer an operating company; it is a holding company with investments directly or indirectly in over 300 subsidiary and affiliated companies, most of whom are engaged in one or more operational phases of the petroleum and chemical industries. Standard's subsidiaries operate in more than 100 countries,

and the market value of its outstanding shares is approximately $13,800,000,000. It employs about 1,600 persons, all of whom are engaged in supervising its investments in its subsidiaries. For many years, Jersey Standard has had no employee, agent, office, real property, bank account, telephone listing, or meeting of directors or shareholders in Colorado, has made no sales or shipments of merchandise in or to Colorado, has done no advertising in and paid no business taxes to Colorado. The absence of such contacts merely emphasizes that Standard has no direct relationship with Colorado, aside from its relationship to Humble.[2]

Humble was incorporated in 1959 and soon became the principal operating United States affiliate of Jersey Standard. The latter acquired Humble's stock, contributed a subsidiary pipeline company, and merged Humble with two other Standard subsidiaries, Carter Oil Company and Esso Standard Oil Company. Humble is now a fully integrated petroleum company, engaged in exploration for and production of crude oil and natural gas, and in refining, transporting and marketing petroleum products and petrochemicals in the United States. At the end of 1964, it had over 35,000 employees and total assets of slightly more than four billion dollars. Its principal place of business is Houston, Texas, but it is qualified to do business in Colorado, has an office in the State, and has approximately 200 employees engaged in exploration, production and marketing in Colorado. Humble is admittedly subject to venue and process in this district under Section 12 of the Clayton Act.

It is Flank's contention that Humble is the "alter ego" of Standard and that the two corporations should be treated as one for purposes of venue and service of process. In support of this, Flank points to the following: (a) Standard owns 100% of Humble's stock; (b) Standard effectively chooses all of Humble's directors (a list of proposed directors is approved by Standard and a general proxy is then granted to designated officers of Humble); (c) Humble's financial reports and account procedures conform to guidelines suggested by Standard, and Humble's balance sheet is consolidated with Standard's; (d) Standard loans money to Humble at current prime rates to fulfill short-term cash needs, and invests cash reserves deposited with it by Humble; (e) Standard has contributed more than $150,000,000 in assets to Humble in the form of a subsidiary pipeline company, and merged Humble with two other Standard subsidiaries; (f) Standard makes available to each of its affiliates (including Humble) the results of its research and that of other affiliates in technology and related fields; (g) Humble is required to submit its projected annual budget to Standard's "Investment Advisory Committee" for its approval, along with other periodic financial statements and operating results;[3] (h) Standard designates one of its directors as the "Contact Director" for Humble and designates another director as his alternate; these men are consulted by Humble's chief executive officers from time to time, receive and evaluate information concerning Humble's financial affairs and operating results, and make recommendations on important policy matters, such as new business ventures, large planned capital investments, corporate financing, corporate reorganizations, relations with other Standard affiliates, and similar problems; (i) Humble's "Contact Directors" keep the pres-

---

2. The absence of such "specific and often minor incidents" has been considered important in cases in which the parent is a manufacturer and the subsidiary is a seller; however, the Supreme Court has refused to extend this "pulverizing approach" to antitrust cases involving holding companies. United States v. Scophony Corporation of America, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 684 (1948).

3. Humble is also required to submit interim additions and deletions to the capital budget in excess of $1,500,000 ($3,000,000 for exploration and production expenditures) to Standard's board of directors for approval.

ident and board of directors of Standard currently informed on the important activities of Humble; (j) Standard is allocated all crude oil imports and Humble then acquires the oil by license under Standard's quotas, as required by the regulations of the Oil Import Administration.[4]

Standard states that each of Humble's employees is responsible to his superior in the Humble organization and is in no way supervised by or reports to any employee of Standard or any of its affiliates; that no director or officer of Humble has ever been a director or officer of Standard while so employed by Humble; and that Humble's management is solely responsible for the day-to-day operation of its business, including accounting, advertising, economics and planning, employee relations, engineering, government relations, law, public relations, research, tax and similar problems. Standard further states that it does not supervise or approve Humble's product prices or markets, and that it receives no reports on these matters "except to the extent that they may be reflected in more general periodic reports of Humble's financial condition or operations."

■ Standard's protestations that Humble's management is "solely responsible for the day-to-day management of its business" and makes marketing and pricing decisions "without supervision or approval by Standard" are conclusions, which rest upon a favorable interpretation of the facts. The evidence nevertheless presents a question of fact, and Flank must carry the burden of proving proper service and venue. Despite the careful formal separation that has been maintained between the two corporations, we are of the opinion that the facts show that Standard exercises significant influence and control over Humble's internal affairs.

**1. The Cudahy Packing line of decisions**

Standard relies heavily on the early case of Cannon Manufacturing Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), and the line of cases which follow it. This was a diversity case in which jurisdiction depended on whether the corporate defendant was "doing business" in North Carolina through its local subsidiary. Process was served upon an agent of Cudahy's subsidiary, whose sole business was to market Cudahy's products in the state. The Court, speaking through the late Mr. Justice Brandeis, said:

"Through ownership of the entire capital stock and otherwise, the defendant dominates the [subsidiary], immediately and completely and exerts its control both commercially and financially in substantially the same way, and mainly through the same individuals, as it does over those selling branches or departments of its business not separately incorporated which are established to market the Cudahy products in other states. The existence of the [subsidiary] as a distinct corporate entity is, however, in all respects observed. Its books are kept separate. All transactions between the two corporations are represented by appropriate entries in their respective books in the same way as if the two were wholly independent corporations. This corporate separation from the general Cudahy business was doubtless adopted solely to secure to the defendant some advantage under the local laws.

\* \* \* \* \* \*

"The question is simply whether the corporate separation carefully maintained, must be ignored in determining the existence of jurisdiction." 267 U. S. at pages 335–336, 45 S.Ct. at page 251.

---

4. Since regulations require crude oil imports to be allocated to the parent and then licensed to its subsidiary, this intervention in Humble's affairs is less than voluntary. OI Reg. 1, § 4(g), 32A C. F.R. 193 (1967). It does, however, provide a point of control over Humble's activities.

In affirming the lower court, which dismissed for lack of jurisdiction, the Court stated:

"In the case at bar, the identity of interest may have been more complete, and the exercise of control over the subsidiary more intimate, than in the three cases cited, but that fact has, in the absence of an applicable statute, no legal significance. The corporate separation, though perhaps merely formal, was real. It was not pure fiction." 267 U.S. at pages 336–337, 45 S.Ct. at page 251.

The *Cudahy* decision placed emphasis on such formal matters as the keeping of separate charters, by-laws and accounts, and discounted as of "no legal significance" such important factors as the parent's purpose (business or investment) in creating the subsidiary, and the degree of economic control exercised by the parent over the subsidiary through stock ownership and other means. Nor does it consider the extent of ultimate impact which is likely to result from the relationship. More recent cases which have followed the strict *Cudahy* reasoning have held that a parent will not be subject to jurisdiction through its subsidiary even though the two corporations are operated by substantially the same officers and directors, so long as the directors hold separate board meetings for each corporation, the officers perform their separate functions at separate times, and all are separately compensated by each corporation. See, e. g., Fisher Baking Co. v. Continental Baking Corp., 238 F.Supp. 322 (D.Utah 1965), and Berkman v. Ann Lewis Shops, Inc., 246 F.2d 44 (2d Cir. 1957). This approach places emphasis on form and tends to disregard substance.

## 2. The International Shoe Case

It is difficult to reconcile this formalism with the broader jurisdictional tests enunciated in the case of International Shoe Co. v. State of Washington,[5] and the numerous decisions which have followed it. In the *Shoe* case the Supreme Court swept aside the notions of "consent," "presence," and "doing business," and upheld personal jurisdiction whenever a defendant has sufficient "minimum contacts" with the forum to satisfy "traditional notions of fair play and substantial justice." As a result, many recent decisions have reconstrued traditional "doing business" statutes to be coextensive with the limits of due process defined in *International Shoe,* and have determined the amenability to jurisdiction of foreign corporations owning local subsidiaries by inquiring whether the parent has the requisite minimum contacts with the forum.[6] See, e. g., Velandra v. Regie Nationale Des Usines Renault, 336 F.2d 292 (6th Cir. 1964); Curtis Publishing Co. v. Cassel, 302 F.2d 132 (10th Cir. 1962); Fooshee v. Interstate Vending Co., 234 F.Supp. 44 (D.Kan.1964); Focht v. Southwestern Skyways, Inc., 220 F. Supp. 441 (D.Colo.1963); S.O.S. Co. v. Bolta Co., 117 F.Supp. 59 (N.D.Ill.1953). Still other courts recognize that ownership of a subsidiary is one contact or factor to be considered in assessing the existence or non-existence of jurisdiction over the parent, and that the extent or degree of ownership can be crucial in assessing the quality and importance of that contact. Velandra v. Regie Nationale Des Usines Renault, 336 F.2d 292, 297 (6th Cir. 1964). See also United States v. Watchmakers of Switzerland Information Center, 134 F.Supp. 710 S.D.N.Y.1955). While these decisions reaffirm the oft-mentioned rule that stock ownership alone is not sufficient to constitute "doing business," they do give it weight. In Steinway v. Majestic Amusement Co., 179 F.2d 681, 684, 18 A. L.R.2d 79 (10th Cir. 1949), our Circuit per Chief Judge Murrah made it clear

5. 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

6. In Cannon Mfg. Co. v. Cudahy Packing Co., the subsidiary was both wholly-owned and the sole distributor of Cudahy's goods in the state. It is some measure of the extent to which the "doing business" test has been liberalized that contacts with a state through a non-exclusive and wholly independent sales representative have been held sufficient to support jurisdiction. Cosper v. Smith & Wesson Arms Co., 53 Cal.2d 77, 346 P.2d 409 (1959).

that stock ownership is of major importance:

"It may be that the more realistic philosophy of the later cases will eventually lead to the recognition of these acts [ownership and voting of majority stock] as legally sufficient to sustain asserted jurisdiction over the non-resident corporation. And, we might now say for ourselves that any such assertion of 'physical power' would not offend 'traditional notions of fair play and substantial justice'."

Cases such as *Steinway* properly discount formal separations of function and subtle efforts to maintain distinct corporate entities. The effort is to ascertain from the total facts the extent of actual control exercised by the parent over the internal affairs of its subsidiary, and if such control is adequately shown, "it is immaterial whether [business activities] are conducted through a branch or a subsidiary corporation, even though the latter's formal independence has been scrupulously preserved." [7] Boryk v. deHavilland Aircraft Co., 341 F.2d 666, 668 (2nd Cir. 1965).

### 3. The Scophony Decision

The leading authority which gives weight to ownership and control is United States v. Scophony Corporation of America, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948). The *Scophony* case, like the one at bar, involved the venue and process provisions of Section 12 of the Clayton Act. At issue was the amenability to jurisdiction and process of a British television equipment corporation which, after efforts to exploit the American market on its own had failed for lack of capital, had joined with American interests in forming a Delaware corporation for the purpose of manufacturing and selling its products in this country. It was the position of the British corporation ("Scophony") that it had ceased to transact business in the United States when its subsidiary ("American Scophony") was formed, and that in subsequently supervising the affairs of American Scophony it was merely protecting its investment in the subsidiary's shares. The Court noted that this approach was evolved in Cannon Mfg. Co. v. Cudahy Packing Co. and other cases involving a manufacturer-parent and a seller-subsidiary, and then refused to extend it to the Scophony situation, where the British corporation resembled a holding company with regard to its interests in the Western Hemisphere. It characterized Cannon Mfg. Co. v. Cudahy Packing Co. as a manufacturer-seller case and inapplicable to a holding company in antitrust litigation. The Court through the late Justice Rutledge went on to say:

"For present purposes those decisions [*Cudahy* and others like it] may be left untouched for the facts and situations in which they have arisen and to which they have been applied. But there could be no valid object in expanding their pulverizing approach to situations as different and distinct as this one, comprehended within neither their rulings nor their effects. More especially would such an extension be inappropriate, when it is recalled that § 12 governs venue and service in antitrust suits against corporations. * * * We are unwilling to construe § 12 in a manner to bring back the evils it abolished, for situations not foreclosed by prior decisions, and thus to defeat its policy together with that of the antitrust laws, so as to make another amendment necessary." 333 U.S. at page 817, 68 S.Ct. at page 866.

Rather than viewing the record as a series of isolated events, the Court noted that Scophony's transaction of business in this country did not cease with the incorporation of its subsidiary. When the entire course of events was viewed as a whole, the Court found that Scophony had not created and maintained American Scophony as an "investment," but

---

7. Compare Cannon Mfg. Co. v. Cudahy Packing Co., supra, where the corporate fiction was considered determinative.

merely as another means of transacting business in this country. Since Scophony's ultimate objective of exploiting the American market had remained the same, the Court decided that a mere change in the methods of achieving this objective did not serve to isolate the company from jurisdiction or process under the antitrust laws. 333 U.S. at page 810–811, 68 S.Ct. at page 863.

In addition to laying stress on the continuity with which Scophony had pursued its business objectives, the Supreme Court noted that it had supervised its subsidiary through stock ownership and other means. Scophony's stock control of its subsidiary was far from complete: although it had the right to elect three of the subsidiary's five directors, the board could not conduct business without the presence of the two American directors. This provision gave the American interests a virtual veto power over American Scophony's operations, and eventually led to a corporate deadlock. Scophony did, however, have the right to choose the subsidiary's president, vice-president and treasurer. In this connection, the Court particularly emphasized that the president of the subsidiary was in effect a representative of Scophony, the British parent:

"He [the president] was not a mere shareholder's or investor's agent seeking information about that corporation's affairs for purposes of dealing with the stock. His functions and activities were much broader and related to Scophony's interests as much as to American Scophony's. Scophony's New York activities therefore were not confined to negotiations and execution of the agreements. Neither were they concerned only with mere stock ownership or 'investment' as is urged, nor were they simply occasional acts of contracting, like those in the decisions appellee cites." 333 U.S. at page 815, 68 S.Ct. at page 865.

\* \* \*

As previously noted, Standard places its chief reliance on the Cudahy line of cases, all of which are concerned with whether the non-resident parent exercises day-to-day control over the subsidiary. In addition to Cudahy there are numerous lower court cases including many antitrust decisions which follow this determinative method. See, e. g., Berkman v. Ann Lewis Shops, Inc., (2nd Cir. 1957) 246 F.2d 44 and Fisher Baking Co. v. Continental Baking Co., (D.C. Utah 1965) 238 F.Supp. 322. These and similar decisions hold that the day-to-day activity test together with separate boards, board meetings and separate bill payments to be controlling. Hence if the subsidiary is free to transact its day-to-day business without interference from the parent the latter is immune from service since it is held not to be "transacting business" within the state. Such holdings are attractive because they establish a degree of certainty in an area in which the lines of authority are difficult to reconcile. Moreover, the rule is simple to administer. This is, however, faint praise when it is considered that the rule leads to virtual immunity from the antitrust suit in a case such as this in which Jersey Standard, the nerve center of a petroleum empire, has painstakingly withdrawn from the mundane daily activity, leaving this to its hundreds of subsidiaries including its giant operating company, Humble.

Although reconciliation of the diverse viewpoints expressed in *Cudahy* and *Scophony* is difficult, we believe that one logical explanation is that *Scophony* is an antitrust case while *Cudahy* is not. This brings Section 12 of the Clayton Act into play and in turn provides a more broad gauge test than was available in *Cudahy*. Also, there are underlying policy reasons in an antitrust case which call for a more penetrating analysis of business activity within a state in search of potential antitrust activity. So where, as here, there exists a great concentration of economic power capable of making a tremendous economic impact while at the same time presenting a picture of formal separation, one must look beyond formalism. For these reasons we are of the opinion that *Sco-*

*phony* furnishes a more accurate guide to decision in this case than does *Cudahy*. Like *Scophony* Standard's acquisition of oil subsidiaries was not primarily for investment. Its object was to promote its oil interests domestically and on the world market. Thus Standard's acquisition of Humble and its vesting Humble with huge assets was for the purpose of operating Standard's domestic oil activity on Standard's behalf. No doubt it could have achieved similar objectives by creating departments or branches within itself. We perceive little difference resulting from the creation of subsidiary corporations and we can see no justification for insulating Standard from jurisdiction and venue on this account. See United States v. Scophony, supra, 68 S.Ct. at page 863, and see Boryk v. deHavilland Aircraft Co., 341 F.2d 666, 668 (2nd Cir. 1965); Waldron v. British Petroleum, (S.D.N.Y. 1957) 149 F.Supp. 830, 834–835.

■ On its facts the case at bar is stronger for finding jurisdiction than was *Scophony*. Lines of control are present here. Standard owns all of Humble's stock,[8] and although Standard and Humble do not have common board members, Standard maintains "contact directors" and an "investment advisory committee," both of which are capable of influencing Humble profoundly. Standard can determine such policy questions as product prices, exploration and research, labor and material costs, selling and advertising expenses, general overhead expenses, etc. The mentioned devices strike us as providing as much or more potential for control than do the more formal matters stressed in Cannon Mfg. Co. v. Cudahy Packing Co. and its progeny. *Scophony* teaches that the parent need not control day-to-day activity of the subsidiary as a prerequisite to jurisdiction. Rather the important test in that case appears to be whether the parent's control is sufficient to influence and control those decisions which might involve violation of the antitrust laws. See *Scophony*, supra, 333 U.S. at page 808, n. 19, 68 S.Ct. at page 862, n. 19. Standard meets this test. It has control sufficient to enable it to determine Humble's important policy decisions. And the methods of control, subtle though they be, must be considered in light of the fact that Standard is a petroleum empire and Humble is an operating giant. This district is unquestionably the most convenient forum for the present lawsuit,[9] and it would be incongruous and contrary to congressional intent to compel the plaintiff to file a separate suit against Standard in the Southern District of New York. See the discussion of congressional history in United States v. National City Lines, 334 U.S. 573, 583–588, 68 S.Ct. 1169, 1175–1177, 92 L.Ed. 1584 (1948). It is impossible in these circumstances to hold that Standard can by legal structure insulate itself from service outside the Southern District of New York.

We conclude that Standard is both "transacting business" and is "found" within this district.

Accordingly, Standard's motions to quash process and to dismiss are denied.

8. In *Scophony*, the board of directors could not function without the presence of the minority members. Thus, competing shareholders had a veto power over the operations of the subsidiary, and this eventually led to a corporate deadlock.

9. Separate suits against Humble and Standard would not only cause inconvenience to the parties and witnesses, but would hamper orderly discovery procedures, while causing a wasteful multiplicity of actions and unnecessary danger of conflicting adjudications.