**CALL CARL, INC., a Delaware Corporation, et al.**

v.

**BP OIL CORPORATION, a Delaware Corporation, and Standard Oil Company (Ohio), a Ohio Corporation**

Civ. No. 73–1059–Y.

United States District Court,
D. Maryland.

Feb. 10, 1975.

Jerry S. Cohen, Herbert E. Milstein, Michael D. Hausfeld, Washington, D. C., William Sammons, Morris Rosenberg, Baltimore, Md., for plaintiffs.

Benjamin R. Civiletti, John Henry Lewin, Sr., John Henry Lewin, Jr., Baltimore, Md., for defendants.

JOSEPH H. YOUNG, District Judge.

This action was instituted by individuals and corporations acting as franchised gas station dealers for the BP Oil Corporation. The defendants are Standard Oil of Ohio (SOHIO), an Ohio corporation which is a refiner and marketer of gasoline, and its wholly owned subsidiary, British Petroleum Oil Corporation (BP), a Delaware corporation engaged in the same business.

The plaintiffs have advanced five theories for relief. The first count alleges that the defendants BP and SOHIO violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (1970), by conspiring with each other and with others to restrain interstate commerce in the retail sale of BP gasoline and gasoline in general, and by attempting to monopolize the retail sale of BP gasoline in the greater Washington, D. C. area. The plaintiffs allege that the two corporations accomplished this by phasing out all existing dealerships, and replacing them with "high-volume" "gas-and-go" stations, owned and controlled by the defendants, at which the defendants would "fix" the retail price of gasoline. The plaintiffs assert that in furtherance of this plan, the defendants terminated the plaintiff's franchise agreements and left them only the option of becoming employee/managers of "gas-and-go" operations; that defendants terminated all BP credit cards to inhibit sales at plaintiffs' stations; and that defendants refused to allocate premium gasoline to the plaintiffs in order to prevent them from competing with the "gas-and-go" stations.

Count II of the complaint alleges that the defendants tied the sale of BP vehicle accessories to the sale of BP gasoline in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14 (1970), thus prohibiting the plaintiffs from purchasing such accessories on the competitive market.

Count III alleges that in abrogating the plaintiffs' contracts without good cause, the defendants unilaterally breached their contractual agreements with the plaintiffs.

Count IV alleges that the defendants fraudulently misrepresented to the plaintiffs that their franchise contracts would be renewed yearly as long as the plaintiffs performed their contractual obligations successfully. Plaintiffs assert

that they relied on these representations in establishing and maintaining retail BP outlets and that the defendants' termination of their contracts was directly contrary to the assertions on which they had relied.

Count V, added by the amended complaint, alleges that the defendants' cancellation of the plaintiffs' contracts and subsequent refusal to allocate gasoline to them violated 10 C.F.R. § 210.62, which requires dealers to allocate gasoline to their retail outlets for the effective dates of the energy regulations on the same basis as during a base period in 1972.

Plaintiffs requested, and the Court granted on June 21, 1974, an injunction preventing the defendants from terminating the plaintiffs' contracts pending the outcome of this litigation. That ruling was upheld by the Fourth Circuit, Call Carl, Inc. v. BP Oil Corp., No. 74-1819 (4th Cir. Apr. 1, 1975).

Defendant SOHIO, after refusing to answer interrogatories and requests for documents, has now moved for a dismissal pursuant to Fed.R.Civ.P. 12 for lack of personal jurisdiction and improper venue on all causes of action raised by the plaintiffs. The defendant has also previously raised the question of improper service of process under Rule 4.

### VENUE AND PERSONAL JURISDICTION UNDER COUNTS I AND II

■ The plaintiffs have the burden of proving jurisdiction and venue in this Court over the defendants under the antitrust counts. Aro Mfg. Co., Inc. v. Automobile Body Research Corp., 352 F.2d 400, 403 (1st Cir. 1965), cert. denied, 383 U.S. 947, 86 S.Ct. 1199, 16 L.Ed.2d 210 (1966); Hayashi v. Sunshine Garden Prod., 285 F.Supp. 632, 633 (W.D.Wash.1967), aff'd sub nom. Hay-

ashi v. Red Wing Peat Corp., 396 F.2d 13 (9th Cir. 1968).

Section 12 of the Clayton Act, 15 U.S. C. § 22 (1970), provides a deceptively simple formula for venue and jurisdiction in antitrust suits:

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

Our inquiry must therefore begin with the question of venue. If venue is appropriate in this jurisdiction, then service of process is authorized in any jurisdiction where SOHIO is found or is an inhabitant.

■ Section 12 was enacted to enlarge venue and jurisdiction over that which existed by virtue of section 7 of the Sherman Act. Section 12, enacted in 1914, added the phrase "transacts business" to the already existing criteria of being "found" or "doing business." [1] Therefore, even if a corporation is not found or doing business in a jurisdiction, it is subject to venue in an antitrust suit if it is transacting business there.

This provision has received considerable attention in the courts, which have generally construed it as providing plaintiffs with a wide choice of forum, United States v. National City Lines, 334 U.S. 573, 586, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 372–74, 47 S.Ct. 400, 71 L.Ed. 684 (1927), regardless of harm to the defendant corporations sued under the Act, Ferguson v. Ford Motor Co., 77 F.Supp. 425, 430 (S.D.N.Y.1948), aff'd sub nom. Ford Motor Co. v. Ryan, 182 F.2d 329

1. *See generally*, United States v. National City Lines, Inc., 334 U.S. 573, 583–88, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948), for a review of the attention which venue received

in Congress while the Clayton Act was under consideration. *See also*, Note, Venue in Private Antitrust Suits, 37 N.Y.U.L.Rev. 268, 271 n. 15 (1962).

(2d Cir.), cert. denied, 340 U.S. 851, 71 S.Ct. 79, 95 L.Ed. 624 (1950). The leading case on the section 12 venue provisions, United States v. Scophony Corp., 333 U.S. 795, 68 S.Ct. 855, 92 L. Ed. 1091 (1948), characterizes judicial construction of the Act as follows:

> [The Supreme Court in *Eastman*] relieved persons injured through corporate violations of the antitrust laws from the "often insuperable obstacle" of resorting to distant forums for redress of wrongs done in the places of their business or residence. A foreign corporation no longer could come to a district, perpetrate there the injuries outlawed, and then by retreating or even without retreating to its headquarters defeat or delay the retribution due.

333 U.S. at 808, 68 S.Ct. at 862 (footnotes omitted).

It is clear from the pleadings and affidavits submitted here that SOHIO itself does not inhabit, is not found, nor does it transact business in this district.[2] Nevertheless, plaintiffs' allegations require a more far-reaching and complicated analysis of "transacting business" under section 12. More and more courts, in antitrust cases, are finding that venue over a foreign parent corporation may be based on the activities of its local subsidiary if the relationship between the parent and subsidiary is such that the subsidiary may be considered the agent or alter ego of the parent. See, e. g., United States v. Scophony Corp., 333 U.S. 795, 817, 68 S.Ct. 855, 92 L.Ed. 1091 (1948); Dobbins v. Kawasaki Motors Corp., 362 F.Supp. 54, 64 (D.Or. 1973); Luria Steel & Trading Corp. v. Ogden Corp., 327 F.Supp. 1345, 1347–48 (E.D.Pa.1971); K. J. Schwartzbaum,

Inc. v. Evans, Inc., 44 F.R.D. 589, 590–91 (S.D.N.Y.1968); Waldron v. British Petroleum Co., 149 F.Supp. 830, 834–36 (S.D.N.Y.1957).

Notwithstanding the fact that the parent may own all of a subsidiary's stock, and interlocking directorships may exist between the two corporations, it is axiomatic that if a subsidiary maintains its own books and accounts, and makes its own marketing, purchasing, management and other policy decisions, it cannot be held to be acting as an agent of the parent. Hayashi v. Sunshine Garden Prod., 285 F.Supp. 632, 634 (W.D.Wash. 1967).

Of course a precise determination as to when a subsidiary stops being a separate legal entity and when it becomes an alter ego of the parent is impossible. The test of venue turns on the facts of each case; generalizations are, for the most part, impossible, United States v. Scophony Corp., 333 U.S. 795, 816–17, 68 S.Ct. 855, 92 L.Ed. 1091 (1948).

It is not isolated acts, but the totality of the relationship between the parent and the subsidiary which must be considered in determining the control exercised by the parent over the subsidiary. Dobbins v. Kawasaki Motors Corp., 362 F.Supp. 54 (D.Or.1973). The key factor, however, in determining venue is the ability of the parent to influence major decisions of the subsidiary which lead or could lead to violations of the antitrust laws. Flank Oil Co. v. Continental Oil Co., 277 F.Supp. 357, 365 (D.Colo.1967). Section 12 is a venue provision peculiar to antitrust law. It is meant to provide injured plaintiffs with the opportunity to reach large corporate enterprises which seek to insulate themselves through the prolifera-

---

2. SOHIO has, through its vice-president Robert Griffin, recited the jurisdictional liturgy usually intoned by foreign corporations trying to evade personal jurisdiction: during the period in question, SOHIO was never incorporated, was not licensed to do business and did not in fact do business in Maryland; it never designated an agent for service of process in the State; it never sold, marketed, advertised or purchased products in the State; it never entered into any contracts, owned property, performed services, maintained an office, facility or telephone number in the State; and it never employed or had any officers or agents present in the State for any purpose. *See generally*, Note, Venue in Private Antitrust Suits, 37 N.Y.U. L.Rev. 268, 282–84 (1965).

tion of subsidiaries which undertake the marketing, purchasing and selling functions of the parent in the local jurisdiction where the activities of the subsidiary are guided by the parent. Control in such cases is a very elusive phenomenon.

SOHIO, seeking to support its position as a separate legal entity from BP, relies upon Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925),[3] which is the leading case *outside* antitrust law on the parent/subsidiary relationship and its impact on jurisdiction and venue, holding that where a corporation has a wholly owned subsidiary which engages in all the marketing, soliciting, selling and distributing that the parent would engage in were it in the jurisdiction, the acts of the subsidiary may not be ascribed to the parent if the separate identities of the two corporations are rigidly maintained. Interlocking directorships and complete ownership of the subsidiary's stock by the parent, taken alone, are insufficient to overcome the integrity of the formal separation. In *Cannon*, Justice Brandeis, for the Court, found that "[t]he corporate separation [between parent and subsidiary], though perhaps merely formal, was real. It was not pure fiction." 267 U.S. at 337, 45 S.Ct. at 251. In order to pierce the corporate veil of the subsidiary and reach the parent under these conditions, the Court found that it was necessary for the parent to control the day-to-day activities of the subsidiary. It should be kept in mind that *Cannon* was handed down twenty years before International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), worked its revolution on the due process requirements for asserting personal jurisdiction.

Although many courts have adopted the *Cannon* rationale in antitrust cases, *e. g.*, Goldlawr, Inc. v. Shubert, 169 F. Supp. 677, 684 (E.D.Pa.1958), aff'd sub nom. Goldlawr, Inc. v. Heiman, 288 F.2d 579 (2d Cir. 1961), rev'd on other grounds, 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962), other courts have rejected the *Cannon* day-to-day control test in antitrust cases on the ground that the liberal provisions of section 12, as interpretated by the Supreme Court in *Scophony*, allow courts to disregard the formalities of corporate structure and to consider the fundamental relationship between the parent and the subsidiary which exists behind the veil of corporate "separateness." [4]

In *Scophony*, the Supreme Court disregarded and left "untouched" the *Cannon* decision and its progeny and disavowed their use in situations such as

---

3. SOHIO's reliance on *Cannon* is reminiscent of Standard Oil of New Jersey's reliance on the same case in Flank Oil Co. v. Continental Oil. Co., 277 F.Supp. 357 (D.Colo.1967).

4. In Flank Oil Co. v. Continental Oil Co., 277 F.Supp. 357 (D.Colo.1967), the court remarked on the impact of *Cannon* on antitrust cases:

 As previously noted, Standard places its chief reliance on the Cudahy line of cases, all of which are concerned with whether the non-resident parent exercises day-to-day control over the subsidiary. . . . Such holdings are attractive because they establish a degree of certainty in an area in which the lines of authority are difficult to reconcile. . . .
 
 Although reconciliation of the diverse viewpoints expressed in *Cudahy* and *Scophony* is difficult, we believe that one logical explanation is that *Scophony* is an antitrust case while *Cudahy* is not. This brings Section 12 of the Clayton Act into play and in turn provides a more broad gauge test than was available in *Cudahy*. Also, there are underlying policy reasons in an antitrust case which call for a more penetrating analysis of business activity within a state in search of potential antitrust activity. So where, as here, there exists a great concentration of economic power capable of making a tremendous economic impact while at the same time presenting a picture of formal separation, one must look beyond formalism. For these reasons we are of the opinion that *Scophony* furnishes a more accurate guide to decision in this case than does *Cudahy*.
 
 277 F.Supp. at 364–65. To the same effect, *see* Waldron v. British Petroleum Co., D.C., 149 F.Supp. 830, 834–35; K. J. Schwartzbaum, Inc. v. Evans, Inc., D.C., 44 F.R.D. 589, 590–91.

that presented in *Scophony*. Since *Scophony* laid *Cannon* to rest, there is no need to resurrect it here.[5] The test applicable in this case is not the *Cannon* day-to-day control test, but the *Scophony* test that a corporation is transacting business if it is engaged in "any substantial business operations" in the local jurisdiction. 333 U.S. at 807, 68 S.Ct. 855.

It will suffice here to detail a few of the cases which have pierced the corporate veil of the subsidiary to reach the parent, in order to illustrate the breadth of the venue statute.

In *Scophony*, the defendant, a British corporation, had transacted business in the United States, but withdrew to England once it had established a subsidiary corporation, American Scophony, in conjunction with Paramount Corporation. Scophony then executed a series of contracts with Paramount in which it transferred all its assets and patents to the subsidiary and gave Paramount exclusive licenses to use the patented processes. The Supreme Court found that the acts of licensing patents to others, contracting to transfer its assets to American Scophony, and owning stock in American Scophony created control in the parent sufficient to enable it to exercise continuing and substantial influence over the internal affairs of the subsidiary. This, in turn, was sufficient to establish venue, and hence personal jurisdiction, over Scophony in New York. In addition, since Scophony had sent its officers and agents to supervise American Scophony's activities, the foreign corporation was held to be "found" in the local jurisdiction.

In *Flank*, the following factors were sufficient to uphold a finding that Standard Oil of New Jersey was transacting business in Colorado through its subsidiary, Humble Oil: Standard chose all of Humble's directors; the subsidiary's balance sheet was consolidated with Standard's; the parent contributed over $150,000,000 in assets and loans to the subsidiary; there was a liaison or "contact" officer to whom the subsidiary had to report major decisions; the parent allocated crude oil imports to the subsidiary; and the subsidiary acquired oil by license under the parent's quota. The court found that Standard's acquisition of Humble was not an investment, but a way to extend its domestic market. It also held that the formal indicia of corporate separation could be disregarded in view of the fact that Standard was a "petroleum empire" and Humble was an "operating giant." 277 F.Supp. at 365.

In Luria Steel & Trading Corp. v. Ogden Corp., 327 F.Supp. 1345 (E.D.Pa. 1971), the court pierced the corporate veil of the subsidiary on the sole ground that certain decisions of the subsidiary had to be approved by the parent, and 10 of the 28 major officers and directors of the parent were also officers of one or another of the parent's affiliated subsidiaries.

In Fooshee v. Interstate Vending Co., 234 F.Supp. 44 (D.Kan.1964), checks for salaries and the purchases of machines were drawn on the parent, parent personnel gave assistance to the subsidiary in bookkeeping and accounting, the parent made substantial loans to the subsidiary, and there was a substantial overlap in officers. The court held that the relationship between the two organizations was greater than that required for mere "interorganizational convenience," and pierced the corporate veil in order to uphold venue under section 12.

In Intermountain Ford Tractor Sales Co. v. Massey-Ferguson Ltd., 210 F. Supp. 930 (D.Utah 1962), aff'd per curiam, 325 F.2d 713 (10th Cir. 1963), cert. denied, 377 U.S. 931, 84 S.Ct. 1334, 12 L.Ed.2d 296 (1964), the court exercised personal jurisdiction over a parent corporation because it found that both parent and subsidiary were run

---

5. The only case to construe section 12 in this Circuit, Donlan v. Carvel, 193 F.Supp. 246 (D.Md.1961) (Thomsen, J.), relied solely on *Scophony* and did not mention *Cannon*.

by an overseeing committee composed of directors of both corporations which coordinated their activities and which exerted direct control over both organizations in furtherance of a comprehensive marketing plan.

Sunrise Toyota, Ltd. v. Toyota Motor Co., 55 F.R.D. 519 (S.D.N.Y.1972), involved the four major components of the Toyota industry: a Japanese manufacturing corporation, a Japanese sales corporation, an American importing corporation and American distributing corporation. The last three corporations were the subsidiaries of the first. The Japanese corporations were held to transact business in California because of the controls which they exercised over the California corporations. There was a substantial overlap in directorships and officers, and important tax and litigation decisions for all corporations came from Japan. Perhaps most important, the literature published by the corporations indicated that the self-image, and the image which the four corporations presented to the public, was that of a single functioning unit.

It is clear, then, that courts have been willing to look past the formal separations between parent and subsidiary to the kinds of control exerted, directly and indirectly, by parent corporations over their subsidiaries. At the same time courts rightly honor the separation when the subsidiary is in fact independent.[6] A subsidiary need not spurn or disregard the corporate policy of its parent in order to maintain inviolate the separate existence of the two corporations, see Fisher Baking Co. v. Continental Baking Corp., 238 F.Supp. 322, 326 (D.Utah 1965), but its policies may not be guided solely in consequence of the corporate policy and management decisions of its parent.[7]

■ To pierce the corporate veil in a case where interlocking directorships exist and there is complete stock ownership of the subsidiary by the parent, it is necessary to find some evidence of conscious control by the parent of a major aspect of the subsidiary's operations.

■ It is evident from the facts before the Court at this stage of the proceedings that SOHIO controlled the marketing decisions of BP upon which the alleged antitrust violations in this case are based; the controls which it did exercise in fact are sufficient to allow this Court to pierce the corporate veil of BP to reach SOHIO for the purpose of establishing venue and jurisdiction in this action.

Plaintiffs have submitted a number of depositions taken of persons who hold major offices in both corporations. What emerges from these depositions is the attitude of SOHIO that BP is merely its marketing arm on the east coast

6. The following decisions have held that the separation was sufficient and controls so few that the separation between parent and subsidiary would be honored: O. S. C. Corp. v. Toshiba America, Inc., 491 F.2d 1064 (9th Cir. 1974) (Japanese corporation made sales to American subsidiary in Japan and did not intrude into subsidiary's affairs); San Antonio Telephone Co. v. American Telephone and Telegraph Co., 364 F.Supp. 1157 (W.D. Tex.1973) (furnishing of interstate long distance telephone services and division of revenue therefrom did not constitute transacting business); Hayashi v. Sunshine Garden Prod., Inc., 285 F.Supp. 632 (W.D. Wash.1967) (stockholding and interlocking directorships only); Zwingle v. Tyson's Foods, Inc., 241 F.Supp. 940 (W.D.Okl. 1965); Pfeiffer v. United Booking Office, Inc., 93 F.Supp. 363 (N.D.Ill.1950) (fact that subsidiary used parent's letterhead and name for business correspondence not sufficient to pierce veil).

7. The Court finds no need and is not prepared to adopt the rationale of Giusti v. Pyrotechnic Ind., Inc., 156 F.2d 351 (9th Cir.), cert. denied sub nom. Triumph Explosives, Inc. v. Giusti, 329 U.S. 787, 67 S. Ct. 355, 91 L.Ed. 675 (1946), which held that where the acts of the conspiracy which violated the antitrust laws occurred in the jurisdiction of suit, the actors would be held to be agents of all corporations who were conspirators. This view has not received complete approval in the courts. See, e. g., Intermountain Ford Tractor Sales Co. v. Massey-Ferguson Ltd., 210 F.Supp. 930 (D. Utah 1962).

whose assets it may "prune," for which it renders services, and which it made a pawn in a substantial interstate marketing game.

What is most persuasive in carrying the plaintiffs' burden is the image which emerges from the depositions of the directors of BP and SOHIO; they regard SOHIO as a major refining corporation and BP as its marketing arm. SOHIO controls, markets, and disposes of BP's assets as if they were its own.

The self-image concept was also an important factor in a similar case, Waldron v. British Petroleum Co., 149 F.Supp. 830 (S.D.N.Y.1957). There the court found that Standard Oil of California regarded California Commercial Corporation, its subsidiary, as a "service corporation" which rendered services for the parent in exchange for revenues. The court pierced the .corporate veil of California Commercial to reach Standard Oil, stating:

> A corporation may be a fiction of the law but there is no reason to carry the fiction to the extreme of saying that a corporation which has wholly owned subsidiaries performing services in the local jurisdiction which ordinarily would be performed by service employees, or making sales which ordinarily would be made by a sales department, is in fact not transacting business in that jurisdiction, particularly when the entire corporate set-up of the defendant shows that it is designed to operate to a substantial degree through separate corporate entities responding to the wishes and directions of the parent and providing the revenues sought by the parent. We would be exalting fiction over fact if [we] were to conclude that under those circumstances the parent company was not in fact transacting business in this District through the instrumentality of its wholly owned subsidiaries.

149 F.Supp. at 835. *See also* K. J. Schwartzbaum, Inc. v. Evans, Inc., 44 F.R.D. 589, 591 (S.D.N.Y.1968) (parent regarded subsidiary as its "New York office"). The rationale of *Waldron* is highly appropriate here.

SOHIO acquired all of the stock of BP in 1970 as a result of a merger with BP's parent company. BP was already transacting business in Maryland at the time of the acquisition. On June 30, 1973, certain BP assets in Georgia, Florida and the Carolinas and one of BP's refineries were sold to American Petrofina. Although SOHIO asserts that these assets were sold by BP, the remarks of Charles H. King, a vice-president of BP, show otherwise. King stated that the sale of these assets occurred pursuant to an agreement between *SOHIO* and American Petrofina. King also characterized the sale as SOHIO "divesting itself of some of its retail assets on the East Coast." At the time of the sale, Mr. King was an officer of SOHIO. (King deposition at 13–14.)

The same deposition also makes it clear that although King holds, and has held, positions with both SOHIO and BP, his corporate loyalties are clear-cut. He may be the servant of two masters, but it is quite clear which master he considers paramount:

Q. By whom are you presently employed?

A. [King] BP Oil, Inc.

Q. In what capacity?

A. Vice president.

Q. Simply vice president, or is it vice president in charge of a particular division? Are you vice president for the entire company?

A. *I am a corporate officer of the Standard Oil Company of Ohio in charge of the BP marketing unit.*

Q. Are you actually employed, then, by Sohio?

A. No. My personnel forms would show an employee of the BP Oil.

Q. You say you're a corporate officer of Standard Oil Company of Ohio. Are you a vice president of Sohio?

A. Yes.

Q. Are you the vice president of Sohio in charge of BP marketing? Is that correct?

A. Uh-huh.

(King deposition at 3–4) (Emphasis added.)

Before King was employed at BP, he had been with SOHIO since 1948. King also stated that in 1973 when he was vice-president in charge of marketing at BP, J. D. Harnett, an executive vice-president of SOHIO, was his immediate superior. When asked if Harnett held any position with BP, King replied "Not to my knowledge." SOHIO has subsequently asserted, and it must be assumed correctly, that at the time Harnett was also an executive vice-president of BP. Nevertheless, what is important for our purpose is not the formal allegiances of the officers involved, but the actual perceived lines of power between the two corporations. This could not be more dramatically illustrated than by King's understanding; he regarded his immediate superior as a SOHIO officer, *not* a BP officer.

Other officers shuffled between the two corporations. Before the acquisition of BP by SOHIO, Robert Griffin was the vice-president for marketing of BP. After the merger he held the same position for SOHIO and King replaced him at BP. Mark Baltis served as the Division Manager for SOHIO's Youngstown, Ohio, Division until 1970 at which time he became the District Manager for BP's Washington sales district. In January, 1974, he returned to SOHIO as a Division Manager for Cincinnati.

Hugh D. Hannah testified on deposition that from 1972 to 1974 he was employed by SOHIO as the Marketing Development Manager for SOHIO, BP and Boron, another SOHIO subsidiary. (Hannah deposition, 6.) In 1974, he was transferred to another SOHIO position.

Assets and services passed between the two corporations. SOHIO regarded one of BP's refineries as its own. On deposition, King stated "—we have three refineries in SOHIO. Two of them are in Ohio—Sohio refineries—one is Marcus Hook, a BP refinery." (King deposition, 10.) The William Penn logo given to low-margin BP stations when the new marketing plan was introduced was owned by SOHIO. (Hickerson deposition, 29.) Griffin's affidavit also reveals that SOHIO, at BP's expense, provided accounting, market study, public relations, labor relations and legal services to the subsidiary. (Griffin affidavit, 4.)

Central to the concern in this case is the "BP Northeast Project," a marketing study of the sales potential of BP gasoline in the Northeastern United States. Lee Hutchinson, a SOHIO employee, was transferred to BP as the Manager of the Market Development Plan in order to undertake a thorough study of major metropolitan markets on the East Coast. Recommendations were formulated by the study group and presented to the *SOHIO* Management Committee and Board of Directors.

The implications to be drawn from this evidence are that SOHIO acquired BP as its marketing arm on the East Coast and controlled its market practices through the formulation and implementation of a major marketing plan. In furtherance of this plan, and of SOHIO's general corporate policies, SOHIO instituted interlocking directorships and officers, and considered BP's officers and assets to be fungible with its own. The defendant has done little to counteract these implications.

The plaintiffs have carried their burden of proof that this Court may exercise venue over OHIO under the "transacting business" standard of 15 U.S.C. § 22.

JURISDICTION OVER SOHIO UNDER COUNTS III, IV AND V

 Courts confronted with federal antitrust claims and related state claims turn to the applicable state long-arm statutes to determine the existence of jurisdiction over the foreign parent

corporation on the state law counts. We do so here to determine whether service of process was adequate for Counts III, IV, and V. In most instances the control exercised over the subsidiary by the parent is sufficient under the long-arm statutes to allow the courts to pierce the corporate veil of the subsidiary in order to reach the parent. *See, e. g.,* Sunrise Toyota, Ltd. v. Toyota Motors, 55 F.R.D. 519 (S.D. N.Y.1972); Hoffman Motors Corp. v. Alfa Romeo S.p.A., 244 F.Supp. 70 (S.D. N.Y.1965).

 "Transacting business" for the purpose of section 12 has a meaning independent of definitions which other courts have given the same phrase in construing other state and federal statutes. *See, e. g.,* Kolb v. Chrysler Corp., 357 F.Supp. 504, 508 (E.D.Wis.1973). Therefore construction of the "transacting business" standard under the Maryland Long-Arm Statute, Md.Ann.Code, Cts. and Jud.Proc.Art, § 6–103 (1974) is a separate and distinct inquiry from that above. In order to pierce the corporate veil of BP to reach SOHIO, the plaintiffs must bring their case within the confines of the piercing doctrine as it has evolved in two Maryland Court of Appeals cases, Vitro Electronics v. Milgray, 255 Md. 498, 258 A.2d 749 (1969), and Harris v. Arlen Properties, Inc., 256 Md. 185, 260 A.2d 22 (1969).

In *Vitro* the Court of Appeals declined to pierce the corporate veil of a Maryland subsidiary corporation wholly owned by its foreign corporate parent despite the fact that the parent's officers were identical with those of the subsidiary and both corporations used the same accountant. The Maryland court declared that "a foreign corporation is not construed as doing business within a state merely because of its ownership of all of the shares of stock of another corporation doing business in the state." 255 Md. at 502, 258 A.2d at 751. Instead the court pointed to the lack of direct contact between the parent corporation and the state and the fact that the two cor-

porations kept separate books and records, used separate accounting procedures and held separate directors' meetings. *See* 255 Md. at 506, 258 A.2d 749. Noting what it termed the "liberal" trend towards reaching parent corporations through their wholly owned subsidiaries, the court specifically refused to join in the trend—distinguishing itself from those courts which agreed with the approach outlined by New York Court of Appeals Judge Fuld in Frummer v. Hilton Hotel Internat'l, Inc., 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967). *See* 255 Md. at 504, 258 A. 2d 749.

Noting that *Vitro* remained good law in Maryland, the Court of Appeals in *Harris*, decided the same year, declared that the corporate veil would not be pierced in Maryland where there was "some independent reason for its existence, other than being under the complete domination and control of another legal entity simply for the purpose of doing its act and bidding." 256 Md. at 199–200, 260 A.2d at 29. In *Harris* a partner in a New York partnership was sued in his individual capacity for damages arising out of a land transaction in Maryland entered into by a New York corporation while owned by the New York partnership. Apart from his ownership interest in the corporation via the partnership, the partner in question had no other contact with the State of Maryland. *See* 256 Md. at 199–201, 260 A.2d at 29. The Court of Appeals reasoned that the sole reason for the corporate existence of the New York corporation was to hold title to real estate for the benefit of the partnership. It therefore found that the corporate entity could be disregarded for jurisdictional purposes.

The almost polar facts of *Harris* and *Vitro* leave a substantial range of activities between a relationship which inextricably involves a parent corporation with its subsidiary and one which does not. *Vitro* was an example of complete corporate separateness, both formally and substantively. Interlocking direct-

orships and ownership of the stock of the subsidiary by the parent, which taken alone or together, have never been held, either in antitrust or non-antitrust law, to be control which renders the subsidiary the agent of the parent.

*Harris* is at the other end of the scale. In that case the only reason for the subsidiary's existence was to serve the interests of the foreign partnership. Control was therefore so extensive that there could not be said to be a difference between the corporate identities of parent and subsidiary.

■ Recognizing that the facts here fall somewhere between *Vitro* and *Harris*, it is necessary to decide where the line between those two cases must be drawn. Sitting as a state court for the purpose of determining jurisdiction, this Court must try to extrapolate from existing state law to decide a question which has not yet been posed to the state courts. *Cf.* Graves v. Assoc. Transport, Inc., 344 F.2d 894, 896 (4th Cir. 1965); Maryland v. Capital Airlines, Inc., 267 F.Supp. 298, 303 (D.Md.1967).

Considering the trend of decisions on this topic at all levels of the state and federal courts,[8] the interest of the State of Maryland in protecting injured plaintiffs from the machinations of foreign corporations which operate in this jurisdiction while shielding themselves behind puppet subsidiaries, and the repeated statements by the Maryland courts that the Maryland Long-Arm Statute was meant to extend to the limits of constitutional due process,[9] it follows that this case comports more closely with both the holding and policy of *Harris* than it does with those of *Vitro*, and that the line which must be drawn between the two cases lies closer to *Vitro* than it does to *Harris*.

■ As elucidated above, SOHIO purchased and used BP as its marketing arm. It controlled BP's marketing decisions through the use of its own officers in BP positions and by the execution and implementation of a major marketing study of BP's potential. SOHIO cannot now retreat to a foreign jurisdiction to evade the repercussions for allegedly wrongful acts.

## SERVICE OF PROCESS

■ Once venue is established under section 12, service of process may be made in any district where a corporation is found or is an inhabitant.

In this case, service for SOHIO was accepted by the defendants' attorney. On October 30, 1973, that attorney admitted service of the complaint for both defendants.

■ Leaving aside the effect of that document, which plaintiffs filed with their complaint as Exhibit 22, service was proper in this case although it was made in this jurisdiction rather than in a jurisdiction in which SOHIO was found or was an inhabitant. Several cases in this area have held that where the corporate veil of the subsidiary is pierced to reach a parent, the subsidiary may be considered the agent of the parent for the purpose of receiving service of process, *see, e. g.*, Intermountain Ford Tractor Sales Co. v. Massey-Ferguson, Ltd., 210 F.Supp. 930 (D.Utah 1962), where the control exercised by the parent over its subsidiary is substantial, service of process made on an agent of the subsidiary is sufficient since it would reasonably be believed that notice of suit would reach the parent. K. J. Schwartzbaum, Inc. v. Evans, Inc., 44 F.R.D. 589, 593 (S.D.N.Y.1968); Boryk v. de Havilland Aircraft Co., 341 F.2d 666 (2d Cir. 1965).

8. *See, e. g.*, Bland v. Kentucky Fried Chicken Corp., 338 F.Supp. 871 (S.D.Tex.1971); Fisher v. First National Bank, 338 F.Supp. 525 (S.D.Iowa 1972); Tokyo Boeki, Inc. v. S.S. Navarino, 324 F.Supp. 361 (S.D.N.Y. 1971); Empire Steel Corp. v. Sup. Ct. of L. A. County, 56 Cal.2d 823, 17 Cal.Rptr. 150, 366 P.2d 502 (1961).

9. *See, e. g.*, Lamprecht v. Piper Aircraft Corp., 262 Md. 126, 130–31, 277 A.2d 272, 275 (1971); Harris v. Arlen Properties, Inc., 256 Md. 185, 196, 260 A.2d 22, 27 (1969); Gilliam v. Moog Ind., Inc., 239 Md. 107, 111, 210 A.2d 390, 392 (1965).

Generally process may be served in a manner which is reasonably calculated to give a party actual notice of the suit instituted against it. Hoffman Motors Corp. v. Alfa Romeo S.p.A., 244 F.Supp. 70, 80 (S.D.N.Y.1965). Service here comported entirely with the policy which underpins Rule 4 and which is reflected in that Rule's formal requirements.

For the same reasons, service was proper on Counts III, IV and V, as effected under Rule 4.

In accordance with the foregoing, it is this 10th day of February, 1975 ordered.

That the defendant Standard Oil of Ohio's motion to dismiss be, and the same is, hereby denied.