**PHONE DIRECTORIES COMPANY, INC., a Utah Corporation, Plaintiff,**

v.

**CONTEL CORPORATION, Defendants.**

**Civ. No. 91–C–673W.**

United States District Court, D. Utah, C.D.

Feb. 14, 1992.

**932**

Richard W. Casey, Mark Y. Hirata, Giauque, Crockett & Bendinger, Salt Lake City, Utah, for plaintiff.

Reid E. Lewis, Mark W. May, Moyle & Draper, P.C., Salt Lake City, Utah, for defendants.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This matter is before the court on Defendant's Motion to Dismiss. The court heard this motion on January 24, 1991. Plaintiff, Phone Directories Company, Inc. ("Phone Directories"), was represented by Richard W. Casey and Mark Y. Hirata. Defendant, Contel Corporation ("Contel"), was represented by Reid E. Lewis and Mark W. May. Before the hearing, the court carefully reviewed the memoranda and all other pertinent papers in the file of the case. Having further considered the law and the facts, the court now renders the following memorandum decision and order.

### PROCEDURAL HISTORY

Phone Directories filed the Complaint in this matter on June 28, 1991. In the Complaint, Phone Directories alleges that Contel has sought to monopolize and restrain trade in telephone directory advertising in violation of the Sherman Anti-trust Act, 15 U.S.C. §§ 1, 2, and the Utah Antitrust Act, U.C.A. §§ 76–10–911 to –920. Phone Directories also alleges that Contel's behavior

with respect to telephone directory advertising violates the Utah Unfair Practices Act, U.C.A. §§ 13–5–1 to –18, and constitutes tortious interference with Phone Directories' business relations.

Before filing an Answer to the Complaint, Contel filed a motion to dismiss this action on August 30, 1991. Contel asserts that venue for this action is improper in the District of Utah, and that this court lacks personal jurisdiction over Contel. *See* Fed. R.Civ.P. 12(b)(2), –(3). Contel argues that the nature and magnitude of its contacts with this district do not satisfy the requirements of either the antitrust venue provisions, 15 U.S.C. §§ 15, 22, or the general venue statute, 28 U.S.C. § 1391(b). Moreover, Contel contends that if its contacts with this district are not sufficient to support venue, they cannot fulfill the requirements of the due process clause with respect to personal jurisdiction.

### FACTUAL BACKGROUND

Phone Directories is a Utah corporation engaged in publishing telephone directories. Its principal place of business is in Orem, Utah. According to the Complaint, Phone Directories competes in the telephone directory publishing market nationwide, including some areas of the state of Utah.

Contel is a holding company incorporated in Delaware and headquartered in Atlanta, Georgia. Contel's subsidiaries, most of which are wholly-owned, are engaged in providing local exchange telephone services, cellular telephone services, and integrated telecommunications and information systems and services. Contel of the West, Inc. ("Contel West") is a wholly-owned subsidiary of Contel.

Contel is qualified to do business, and is doing business, in Georgia. Contel does not have an office in Utah. It does not directly employee any persons in Utah. Contel does not have any bank accounts in Utah nor does it own any real property in Utah. Contel is not subject to the regulatory jurisdiction of the Utah Public Service Commission or any other Utah regulatory agency.

Contel West is a telephone operating company that provides local communications and information services to customers in Utah, Arizona, New Mexico, and Idaho. Contel West is incorporated in the state of Arizona. It is subject to the regulatory jurisdiction of the Utah Public Service Commission and various other Utah regulatory agencies. Contel West is interconnected with other telephone companies and the toll networks of national long distance carriers.

Contel and Contel West are separately incorporated. They are each governed by separate, independent boards of directors. The companies do not share directors. Contel and Contel West each maintain separate books and records. Contel, however, monitors the books and records of Contel West.

## DISCUSSION

The general issues presented by Contel's Motion to Dismiss are: (1) whether venue is proper in the District of Utah; and, if so, (2) whether this court has personal jurisdiction over Contel.[1]

### A. *Standard of Review.*

 Plaintiff bears the burden of establishing this court's jurisdiction over the defendant. *Taylor v. Phelan,* 912 F.2d 429, 431 (10th Cir.1990), *cert. denied,* ── U.S. ──, 111 S.Ct. 786, 112 L.Ed.2d 849 (1991) (citing *Behagen v. Amateur Basketball Ass'n of U.S.A.,* 744 F.2d 731, 733 (10th Cir.1984), *cert. denied,* 471 U.S. 1010,

---

**1.** Generally, a court should determine whether it has jurisdiction over the person of the defendant before deciding where venue is proper. *Leroy v. Great Western United Corp.,* 443 U.S. 173, 180, 99 S.Ct. 2710, 2714, 61 L.Ed.2d 464 (1979). However, "when there is a sound prudential justification for doing so, ... a court may reverse the normal order of considering personal jurisdiction and venue." *Id.* In this case, both parties assert that the venue and personal jurisdiction analyses for a non-resident corporate antitrust defendant are virtually the same. In accord with this assumption, the parties have devoted most of their argument to the issue of whether venue is proper in this district. For this reason, this court will turn first to the issue of venue and then consider whether it has personal jurisdiction over Contel.

105 S.Ct. 1879, 85 L.Ed.2d 171 (1985)). *See also Bartholomew v. Virginia Chiropractic Ass'n,* 612 F.2d 812, 816 (4th Cir. 1979), *cert. denied,* 446 U.S. 938, 100 S.Ct. 2158, 64 L.Ed.2d 791 (1980) (plaintiff bears burden of establishing that venue is proper). When a motion to dismiss for lack of personal jurisdiction is brought before trial and supported by affidavits and other written materials, however, plaintiff need only make a prima facie showing of jurisdiction. *Taylor,* 912 F.2d at 431; *Smokey's of Tulsa, Inc. v. American Honda Motor Co.,* 453 F.Supp. 1265, 1272 (E.D.Okla.1978) (venue). In assessing whether plaintiff has met its burden, allegations in the complaint that are uncontroverted by defendant's affidavits must be taken as true and all factual disputes should be resolved in favor of plaintiff. *Taylor,* 912 F.2d at 431.

### B. *Venue.*

Although Contel argues that neither provision is satisfied, the parties apparently agree that only two venue statutes are relevant to this case: the special antitrust venue provision of § 12 of the Clayton Act, 15 U.S.C. § 22, and the general venue provisions of 28 U.S.C. § 1391(b).[2] Phone Directories argues that § 12 applies to this case because Contel "transacts business" in this district through its subsidiary, Contel West. Phone Directories also argues that § 1391(b) applies because Phone Directories' claim arose here.

#### 1. Venue Under Section 12 of the Clayton Act.

Section 12 of the Clayton Act provides:

---

**2.** In the Complaint, Phone Directories alleges that venue for this action is proper in this court under 28 U.S.C. § 1400(a). As Contel points out, however, § 1400(a) establishes the venue requirements for patent and copyright claims. Apparently, Phone Directories' citation to § 1400 in the Complaint was in error.

Another basis for venue in antitrust actions is provided by § 4 of the Clayton Act, 15 U.S.C. § 15(a), which allows for suit in any district where the defendant "resides or is found or has an agent." Phone Directories does not argue that the requirements of § 4 are satisfied in this case.

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22.

The parties agree that Contel is not an inhabitant of this district and cannot be found here. Thus, the essential issue with respect to § 12 is whether Contel's relationship with its subsidiary, Contel West, is such that Contel can be deemed to have transacted business in this district through Contel West. Phone Directories and Contel, however, fundamentally disagree over the meaning of the phrase "transacts business" as it applies in the context of a parent-subsidiary relationship. Contel urges that a parent company must be found to have directed "the detailed day-to-day activities" of the subsidiary before venue is proper. In contrast, Phone Directories argues that the parent company need only have "the ability to influence and control the decisions of its subsidiary."

The disagreement between the parties as to the appropriate test reflects the divergent approaches that federal courts have taken in addressing this issue. Most decisions converge around either the day-to-day control test or the ability to influence test as the appropriate measure for determining whether a parent transacts business through its subsidiary. See In re Chicken Litigation, 407 F.Supp. 1285, 1293 (N.D.Ga.1975) (noting existence of two distinct tests). Unfortunately, there is relatively little directly controlling authority for this court to follow in determining the proper test. Therefore, this court is required to decide the issue.

### a. Scophony

In attempting to determine which of these tests is proper, the primary authority is the Supreme Court of the United States' opinion in United States v. Scophony Corp. of America, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948). In Scophony, the Supreme Court considered whether the activities of a British holding company vis-a-vis its American subsidiary constituted transacting business under § 12 of the Clayton Act. The British parent company, Scophony, originally had begun to do business in the United States directly. During World War II, however, the company was unable to import sufficient capital to maintain its operations here. In order to continue its presence in America, Scophony was forced to create a subsidiary, American Scophony, in conjunction with two American firms.

In considering whether venue was proper in New York for an antitrust action by the United States against Scophony, the Scophony Court began by emphasizing the remedial purpose of the "transacts business" provision of § 12. Section 12 was intended by Congress to "enlarge" the more stringent venue provision of § 7 of the Sherman Antitrust Act. Id. at 806, 68 S.Ct. at 861. Under § 7, venue is proper only in those districts where the defendant resides or is found. Id. at 805, 68 S.Ct. at 860. Decisions construing § 7 had equated the term "found" with that of formally "doing business" and being "present" in a district. Id. at 805, n. 14, 68 S.Ct. at 860, n. 14. This interpretation often created an "insuperable obstacle" for plaintiffs who sought to sue non-resident corporations in the plaintiffs' own districts. Id. at 806 n. 16, 68 S.Ct. at 861 n. 16. The "transacts business" language of § 12 was intended to remedy this situation by providing "a much broader meaning for establishing venue than the concept of 'carrying on business' denoted by 'found' under the preexisting statute and decisions." Id. at 807, 68 S.Ct. at 861.

In order to effect the remedial purpose of § 12, the Scophony Court directed that the determination of whether a firm transacts business in a particular district is to be made with reference to "the practical and broader business conception of engaging in any substantial business operations." Id. The "highly technical distinctions" glossed upon the term "found" in § 7 of the Sherman Antitrust Act should be avoided in

analyzing whether a defendant transacts business under § 12. *Id.* By adopting the practical everyday meaning of transacts business, courts can provide relief to those

> injured through corporate violations of the antitrust laws from the 'often insuperable obstacle' of resorting to distant forums for redress of wrongs done in the places of their business or residence. A foreign corporation no longer could come to a district, perpetrate there the injuries outlawed, and then by retreating or even without retreating to its headquarters defeat or delay the retribution due.

*Id.* at 808, 68 S.Ct. at 862 (footnote omitted).

Applying these principles to Scophony, the Court concluded that the British company had transacted business in New York by virtue of its involvement in the affairs of American Scophony. The Court dismissed Scophony's contention that it was merely an investor seeking to protect its investment. *Id.* at 814–15, 68 S.Ct. at 865. Rather, the Court found that Scophony's creation of American Scophony was nothing more than a change in the methods used by the British parent company to maintain and perpetuate its continuing presence in the United States.[3] *Id.* at 810–11, 68 S.Ct. at 863.

The Court concluded not only that Scophony had transacted business in New York by virtue of its control over American Scophony, but also that the facts were sufficient to show that the British parent company was *"found"* in New York for the purposes of the service of process provision of § 12. *Id.* at 818, 68 S.Ct. at 866 (emphasis added). The Court rejected Scophony's argument that the definition of "found" contained in other venue and jurisdiction statutes and decisions, such as *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), should also be applied to the service of process provision in § 12. According to the Court, *Cudahy*[4] and similar decisions had developed "a check list of specific and often minor incidents of that sort of business done or not done as relevant to whether business is being carried on." *Id.* 333 U.S. at 813, 68 S.Ct. at 864. The Court declined to apply these decisions because they involved manufacturers and sellers, rather than holding companies like Scophony. *Id.* at 817, 68 S.Ct. at 866. More importantly, the Court concluded that it would be "inappropriate" to apply these decisions, "when it is recalled that § 12 governs venue and service in antitrust suits against corporations." *Id.*

### b. *Tenth Circuit Authority*

Aside from *Scophony*, there is little directly controlling authority on the proper test to apply in determining whether a

---

**3.** In particular, the Court noted that the controls established by the contracts that created American Scophony called for Scophony's "continuing exercise of supervision over and intervention in" the affairs of its subsidiary. *Scophony*, 333 U.S. at 814, 68 S.Ct. at 865. The "continuing and pervasive effects" of these agreements were illustrated by Scophony's power to appoint directors and officers to American Scophony, *id.*, as well as the provisions calling for the interchange of data and information between the two companies. *Id.* at 815, 68 S.Ct. at 865. Moreover, according to the Court, the dual role played by some officers of American Scophony, who also acted as agents of Scophony, was evidence that these powers were used. *Id.*

**4.** In *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), the Supreme Court considered whether a parent manufacturing company was doing business through its wholly-owned subsidiary in North Carolina "in such a manner and to such an extent as to warrant the inference that [the

parent company] was present there." *Id.* at 334–35, 45 S.Ct. at 250. The parent company had established the subsidiary in North Carolina for the purpose of selling the parent company's products in that state. The issue arose because the plaintiff in *Cudahy* attempted to make service of process on the parent company through the office of the parent's subsidiary in North Carolina. *Id.* at 334, 45 S.Ct. at 250. The parent company moved to have the district court quash the service, arguing that the subsidiary company was a separate legal entity. Despite finding that the parent exercised immediate and complete control over the operations of the subsidiary, the trial court granted the parent company's motion because the formal aspects of the subsidiary's separate legal existence were strictly observed. *Id.* at 335, 45 S.Ct. at 251. On appeal, the Supreme Court affirmed, agreeing with the district court that "[t]he corporate separation, though perhaps merely formal, was real. It was not pure fiction." *Id.* at 337, 45 S.Ct. at 251.

holding company can be deemed to have transacted business in a district by virtue of its control over a subsidiary company. The United States Court of Appeals for the Tenth Circuit's only decision on this subject, *Massey–Ferguson Ltd. v. Intermountain Ford Tractor Sales Co.*, 325 F.2d 713 (10th Cir.1963), *aff'g* 210 F.Supp. 930 (D.Utah 1962), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1334, 12 L.Ed.2d 296 (1964), consists of a summary, one-paragraph statement affirming the district court's finding that the parent corporation "was enabled to and did direct 'the detailed activities of [its subsidiary]....' and that it was, therefore, transacting business and found through its subsidiary within the District [of Utah]." *Id.* at 714 (quoting *Intermountain Ford Tractor Sales Co. v. Massey–Ferguson Ltd.*, 210 F.Supp. 930, 939 (D.Utah 1962)).

This court is unable to accept, as Contel urges, that the Tenth Circuit's opinion in *Massey–Ferguson* should be viewed as stating a broad, generally-applicable rule of law that is controlling in this case. Rather, this court believes that if the court of appeals had intended that result, it would have said so expressly. The plain language of the opinion, however, makes clear that instead of articulating a test to be applied in all future cases, the court of appeals merely affirmed the factual findings of the trial court and concluded that they were sufficient to establish venue. The opinion can hardly be read as foreclosing venue in every other case where a parent corporation is shown to exert less control over its subsidiary than did Massey–Ferguson.

Indeed, subsequent decisions from district courts within the Tenth Circuit demonstrate that the issue of which test is proper in cases such as this has yet to be clearly resolved. Two of these decisions, in particular, illustrate that district courts from within this circuit continue to pursue two fundamentally dichotomous approaches in deciding what degree of control a holding company must exercise over its subsidiary in order to be found transacting business under § 12. These two decisions merit discussion in some detail.

### c. *Fisher Baking*

The court's decision in *Fisher Baking Co. v. Continental Baking Corp.*, 238 F.Supp. 322 (D.Utah 1965), is cited by Contel in support of its position that a holding company must exercise control over the detailed day-to-day operations of its subsidiary in order to be found transacting business through its subsidiary. The question in *Fisher* was whether venue was proper in the District of Utah in an action against General Baking Company ("General") by virtue of the company's control over its wholly-owned subsidiaries, Eddy Bakeries ("Eddy") and Royal Baking Company ("Royal"). General did not reside in Utah nor was it found in the state, although both Eddy and Royal were found in the state.

Despite close links between the companies,[5] Judge Christensen concluded that General did not exercise sufficient control over Eddy to warrant "piercing the corporate veil." *Id.* at 326. The court found that General had the ability to exercise "whatever degree of control [it] chose to exercise" over its subsidiary. *Id.* at 325. Despite this power, however, General did not exercise "any control over the day to day operations" of Eddy, nor did it "direct the detailed activities" of the subsidiary. *Id.* Rather, the court found that

[e]xcept for the foregoing[6] interorganizational contact and coordination, and

**5.** In addition to General's ownership of one hundred percent of Eddy's stock, the court found that some members of General's board of directors became directors of Eddy, although no officer or director of General ever became an officer or director of Eddy. Moreover, General was kept "closely informed" of Eddy's operations, *Fisher*, 238 F.Supp. at 326, and there was "substantial communication" between the personnel of General and Eddy. *Id.* at 325. General's board of directors occasionally approved certain leases

and major purchases by Eddy. In addition, on one occasion, General's board approved a compensation package for certain Eddy management personnel. Eddy management personnel were also covered by General's management bonus incentive plan. *Id.* at 326. Finally, Eddy was often referred to by both companies as a division of General. Royal was a wholly-owned subsidiary of Eddy.

**6.** *See supra* note 6.

particularly with regard to its day by day operations, Eddy has operated as a separate corporate entity and the separate corporate forms were meticulously observed. In general the interchange of information, personnel and reports and the other inter-organizational contact were of a nature that might be expected between parent and subsidiary, and seemed designed to effectuate that relationship rather than to accomplish any merger of activities.

*Id.* at 326. According to the court, "The two corporations do not have to live in two entirely [sic] business worlds as the price of their recognition as separate entities." *Id.*

The *Fisher* court based its legal analysis primarily on the Supreme Court's opinion in *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925).[7] The *Fisher* court expressly rejected the argument that the Supreme Court's decision in *Scophony* altered the applicability of *Cudahy*. According to the *Fisher* court, *Scophony* did not change

"the established rule with respect to subsidiaries ..., for *Scophony* did not give any weight to common management, did not consider that the foreign corporation was transacting business locally because of the activities of any local corporation, but held that there was a pervasive and continuing transaction of business directly by the parent."[8] *Fisher*, 238 F.Supp. at 328 n. 6.

### d. Flank Oil

The court's rationale in *Fisher*, and in particular its reliance on the *Cudahy* decision, stands in contrast to the reasoning of Judge Doyle in *Flank Oil Co. v. Continental Oil Co.*, 277 F.Supp. 357 (D.Colo.1967). The facts in *Flank* showed that a holding company, Standard Oil of New Jersey ("Standard"), which was not found in Colorado, owned one hundred percent of the Humble Oil Company ("Humble"), a separately incorporated company that was present in Colorado. *Id.* at 359.

After considering the relationship between the two companies,[9] the court con-

---

**7.** *See supra* note 4 (discussing *Cudahy*). Judge Christensen also contrasted the facts of *Fisher* with the facts of *Intermountain Tractor Sales Co. v. Massey–Ferguson Ltd.*, 210 F.Supp. 930 (D.Utah 1962) (Christensen, J.), *aff'd per curiam*, 325 F.2d 713 (10th Cir.1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1334, 12 L.Ed.2d 296 (1964).

**8.** The *Fisher* decision reflects the view taken by a least two United States Courts of Appeals, as well as a number of district courts. *See, e.g., San Antonio Tel. Co., Inc. v. American Tel. & Tel. Co.*, 499 F.2d 349 (5th Cir.1974) (citing *Fisher*); *O.S.C. Corp. v. Toshiba America, Inc.*, 491 F.2d 1064 (9th Cir.1974) (citing Judge Christensen's opinion in *Massey–Ferguson*); *Chrysler Corp. v. General Motors Corp.*, 589 F.Supp. 1182 (D.D.C.1984); *Grappone, Inc. v. Subaru of Amer., Inc.*, 403 F.Supp. 123 (D.N.H.1975).

Contel also cites *Tiger Trash v. Browning–Ferris Indus., Inc.*, 560 F.2d 818 (7th Cir.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978), as having adopting the day-to-day control test. A fair reading of the case, however, compels a different interpretation. The *Tiger Trash* court did recognize "that a parent-subsidiary relationship consisting of mere investment holding by the parent would not be sufficient to bring it within [§ 12]." *Id.* at 823. It also acknowledged that limited inter-organizational activities such as record reporting or monitoring would not satisfy § 12 either. *Id.* (citing *Fisher*). The court, however, concluded that "the fact that the subsidiary is not

controlled to an ultimate degree is irrelevant to the decision to pierce the corporate veil for venue purposes." *Id.* at 824. According to the court, to take a such a position would

enable large American corporations like [Browning–Ferris Industries] to circumvent the antitrust laws by incorporating the many functional subparts of the parent into local operations. This would thwart the Congressional intent to liberalize the restrictive venue provision in Section 7 of the Sherman Act by enacting Section 12 of the Clayton Act.

*Id.*

**9.** In addition to evidence that Standard owned all of Humble's stock, the plaintiff produced proof that Standard: chose Humble's directors; suggested financial and accounting guidelines for Humble; loaned money and contributed assets to Humble; provided Humble with research and technology; required Humble to submit an annual budget for approval; and appointed to Humble's a director whose responsibility was to act as a liaison with Standard. *Flank*, 277 F.Supp. at 360–61. Standard, on the other hand, contended that no employee of Humble was directly supervised by Standard; the companies did not share directors; Humble's management was solely responsible for the day-to-day management of the subsidiary; and, Standard did not supervise or approve Humble's daily pricing or markets, or require reports on such, except for general periodic reports on Humble's financial condition. *Id.* at 361.

cluded that "[d]espite the careful formal separation that has been maintained between the two corporations, ... the facts show that Standard exercises significant influence and control over Humble's internal affairs." *Id.* at 361. As such, the court found that Standard both transacted business and was found in the district for the purposes of establishing venue under § 12. *Id.* at 365. In reaching this conclusion, the *Flank* court undertook a careful analysis of the contradictory positions taken by other courts with respect to this issue.

The court first examined the *Cudahy* decision and the cases that follow it in adopting the day-to-day control test. According to the *Flank* court, these cases, including *Fisher,*

> hold that the day-to-day activity test together with separate boards, board meetings and separate bill payments to be controlling. Hence if the subsidiary is free to transact its day-to-day business without interference from the parent the latter is immune from service since it is held not be to "transacting business" within the state.[10]

*Id.* at 364.

The court concluded that although the day-to-day control test may be attractive because it establishes "a degree of certainty in an area in which the lines of authority are difficult to reconcile" and is "simple to administer," such tributes are "faint praise" when the *results* of the day-to-day cases are considered. *Id.* According to the court, these decisions give corporations a "virtual immunity from the antitrust suit in a case such as this in which [the corporate nerve center] has painstakingly withdrawn from the mundane daily activity, leaving this to its hundreds of subsidiaries." *Id.*

In the *Flank* court's view, the better approach is reflected in many of those venue and jurisdiction cases, such as *International Shoe Co. v. Washington,* 326 U.S.

310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), that "properly discount formal separations of function and subtle efforts to maintain distinct corporate entities" and, instead, focus on the "actual control" of the parent over the subsidiary. *Id.* at 362. The court cited *Scophony* as "[t]he leading authority which gives weight to ownership and control." *Id.* at 363.

In attempting the difficult task of reconciling these two lines of cases, the court noted that one important difference is that *Scophony* is an antitrust case, which "brings Section 12 of the Clayton Act into play and in turn provides a more broad gauge test than was available in *Cudahy.*" *Id.* at 364. An equally important distinction, however, is that "there are underlying policy reasons in an antitrust case which call for a more penetrating analysis of business activity within a state in search of potential antitrust activity." *Id.* As such, the court chose to follow *Scophony.*

According to the court,

> *Scophony* teaches that the parent need not control day-to-day activity of the subsidiary as a prerequisite to jurisdiction. Rather *the important test in that case appears to be whether the parent's control is sufficient to influence and control those decisions which might involve violation of the antitrust laws.*

*Id.* at 365 (citations omitted) (emphasis added).

Applying *Scophony,* the *Flank* court concluded that Standard's investment in Humble was not primarily for investment purposes, but was intended to promote Standard's oil interests. *Id.* Moreover, Standard could have achieved its objectives by creating branches within the company, and the creation of a separate subsidiary made little difference to Standard's ultimate objectives. *Id.* The fact that Standard could determine key policy questions for Humble provided "as much or more potential for control than [did] the more

---

**10.** According to the court, the *Cudahy* decision emphasized such formal matters as whether the companies kept separate charters, by-laws and accounts. *Flank,* 277 F.Supp. at 362. At the same time, the *Cudahy* decision discounted

"such important factors as the parent's purpose (business of investment) in creating the subsidiary, and the degree of economic control exercised by the parent over the subsidiary through stock ownership and other means." *Id.*

formal matters stressed in [*Cudahy*].” *Id.* Standard had “control sufficient to enable it to determine Humble's important policy decisions. And the methods of control, subtle though they be, must be considered in light of the fact that Standard is an operating giant.” *Id.* (citations omitted). Therefore, the court concluded, venue in the action against Standard was proper in the District of Colorado.[11]

### e. *The Proper § 12 Test*

■ Reconciling the Fisher and Flank cases is a difficult task. There are some similarities between the cases: both cases agree that a parent must exercise *some* degree of control over its subsidiary's practices; and, both cases apparently agree that mere investment by a holding company in a subsidiary is not enough.[12] Although recognizing that *Fisher* and cases adhering to the day-to-day control test are numerous, this court concludes that the test articulated by the *Flank* court is the appropriate test for determining whether venue is proper under § 12 in the context of a parent-subsidiary relationship. This conclusion is based on several interrelated considerations.

First, this court believes that *Scophony* provides the controlling authority for this case. The court believes that *Fisher* and many other day-to-day control test cases rely on inapposite case law, namely *Cudahy*. In *Scophony*, the Supreme Court expressly declined to apply *Cudahy* in defining the language of the service of process provision of § 12. According to the Court, *Cudahy* was factually and legally distinguishable from antitrust cases involving holding companies and their subsidiaries. For one thing, the parents and subsidiaries involved in *Cudahy* and similar cases were manufacturers and sellers. More importantly, *Cudahy* and the other doing business cases were not antitrust cases involving § 12.

Second, the test advocated in *Flank* and adopted here is most consistent with the liberal approach to venue under § 12 mandated by the Supreme Court's decision in *Scophony*.[13] Adopting the day-to-day control test, on the other hand, would give the transacts business language of § 12 a definition much closer to that of found or doing business—the stringent definitions that § 12 was intended to ameliorate.

Third, the day-to-day control test is inconsistent with contemporary economic realities. As the *Flank* court stated, there

**11.** Examples of decisions taking an approach similar to that of the *Flank* court include: *Tiger Trash v. Browning–Ferris Indus., Inc.,* 560 F.2d 818 (7th Cir.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.,* 402 F.Supp. 262 (E.D.Penn.1975); *Hitt v. Nissan Motor Co., Ltd.,* 399 F.Supp. 838, 840–43 (S.D.Fla.1975).

**12.** *See also Reynolds Metals Co. v. Columbia Gas System, Inc.,* 669 F.Supp. 744 (E.D.Va.1987) (critical inquiry is whether parent holds subsidiary as mere investment or as means of transacting business).

**13.** The Supreme Court reiterated the remedial purposes of § 12 in *United States v. National City Lines, Inc.,* 334 U.S. 573, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948), where the Court determined that when an antitrust action is brought in any district authorized under § 12, the action cannot be transferred under the doctrine of *forum non conveniens.* In its opinion, the *National City Lines* Court extensively examined the legislative history of § 12. *Id.* at 582–88, 68 S.Ct. at 1174–77. The Court concluded that in enacting § 12, Congress was not concerned about abuse of the venue provisions by plaintiffs. *Id.* at 581, 68 S.Ct. at 1174. Nor was it concerned with making it easier for defendants to defeat plaintiffs' choices of venue. Rather, Congress' concern “was to provide broader and more effective relief, both substantively and procedurally, for persons injured by violations of its antitrust policy.” *Id.* at 581, 68 S.Ct. at 1174.

More recently, the United States Court of Appeals for the Ninth Circuit has cited the remedial purpose of § 12 as a basis for concluding that the nationwide service of process provision of that section may be used by a plaintiff even if venue is established under 28 U.S.C. § 1391. *Go–Video, Inc. v. Akai Elec. Co., Ltd.,* 885 F.2d 1406, 1410–11 (9th Cir.1989). *See also Board of City Comm'rs v. Wilshire Oil Co. of Texas,* 523 F.2d 125, 132 (10th Cir.1975) (citing remedial purpose of § 12 in determining that general venue statute supplements venue provisions of § 12); *Lee v. Ply*Gem Indus. Inc.,* 593 F.2d 1266 (D.C.Cir.), *cert. denied,* 441 U.S. 967, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979) (citing remedial purpose of § 12 as basis for concluding that relevant date for determining when defendant transacted business is date that cause of action arose).

are important policy considerations in an antitrust case that call for a more careful analysis of the relationships among businesses when attempting to ascertain potential antitrust activity. The type of behavior complained of in antitrust actions is often facilitated by the holding company structure. The formation of large conglomerates in the form of holding companies permits the "great concentration of economic power capable of making a tremendous economic impact while at the same time presenting a picture of formal separation." *Flank*, 277 F.Supp. at 364. In order to make the antitrust statutes effective and permit plaintiffs to have the greatest latitude in seeking redress from the evils of antitrust law violation, the court must be willing to look beyond such formalism.[14]

2. Venue in the Instant Case.

■ Applying the *Flank* test to the facts of the instant case, this court concludes that venue in this action is proper in the District of Utah. There is sufficient evidence in the record to establish that Contel significantly influences, if not controls, the activities of Contel West with regard to telephone directory advertising, including those activities occurring in Utah. The undisputed evidence establishes that Contel has created a unified administrative structure that divides its subsidiaries into four sectors, one of which is the Telephone Operations Sector. The Telephone Operations Sector, in turn, is divided into three geographical regions: the Eastern Region, the Central Region, and the Western Region. The regions are further divided into twelve divisions that each include one or more telephone operating companies. Contel West and another wholly-owned subsidiary

of Contel, Contel of the Northwest, Inc. ("Contel Northwest"), are part of the Mountain West Division of the Western Region of Contel.

The court finds that Contel uses this administrative structure to direct the directory publishing activities of its wholly-owned subsidiary, Contel West.[15] This is confirmed by the deposition testimony of Sharon Doolin. Doolin is a Directory Analyst for the Mountain West Division.[16] Contel does not dispute that in this capacity, Doolin is in charge of virtually all aspects of the Contel West directories. The court finds that Doolin's responsibilities include: (1) initiating and processing license agreements for parties who purchase Contel's subscriber listings; (2) supervising billing to advertising subscribers; (3) analyzing methods for increasing yellow page advertising revenues; and (4) working with Contel West's (and presumably Contel Northwest's) directory publisher to ensure satisfactory and accurate publishing of Contel telephone directories in the Mountain West Division.

It is also undisputed that Contel provides administrative and strategic direction to its sectors and their administrative subparts. The court concludes that an important example of this practice is Contel's promulgation of Management Administrative Procedures ("MAPs"). Among other things, Contel's MAP entitled "Handling Requests For Release of Subscriber Listings" establishes "the" policy and procedure for handling the release of telephone subscriber listings by Contel's telephone operating subsidiaries to persons and firms outside of Contel. This MAP also dictates the prices at which subscriber listings are sold to interested parties, and establishes procedures for protecting Contel subsidiaries'

14. *See also Tiger Trash v. Browning–Ferris Indus. Co.*, 560 F.2d 818, 824 (7th Cir.1977) (corporations should not be allowed to circumvent antitrust laws by incorporating into many local subparts).

15. The court finds that this organizational structure is hierarchical; that is, the divisional offices report to the regional offices, who in turn report to the corporate offices.

16. Contel attempts to obfuscate Doolin's employment relation by claiming that she "works" for both Contel West and Contel Northwest. The court finds that although it is true that Doolin performs services for both subsidiaries, Doolin is *employed* by the Mountain West Division of Contel. *Compare* Contel Corporation's Appendix of Exhibits, Exhibit I, *Affidavit of Sharon Doolin*, ¶¶ 1, 2, *with* Contel Corporation's Reply Memorandum in Support of Motion to Dismiss, at 7–8, ¶¶ 13, 14.

copyrighted directories from infringement by competitors. Although the divisions may have some latitude in interpreting these policies, there is no evidence to suggest that the divisions are free to completely disregard these policies.[17]

The content of the subscriber listings MAP reinforces this court's conclusion that Contel exerts considerable control over its subsidiaries' telephone directory activities via its regional and divisional offices. The provisions of the MAP are very specific. In most cases, the release of subscriber listings must be coordinated through the appropriate Contel Division Directory Coordinator or Division Manager. For example, paragraph 3.03(c) provides, "The Division Manager or designated representative will approve and coordinate all requests for the release of subscriber listings to other telephone companies or their authorized directory publishers." Likewise, paragraph 3.04(d) provides that once an agreement to license subscriber listings to other telephone companies is reached, "the Directory Listings License Agreement will be signed by the Division Manager on behalf of the Contel company owning the listings to be licensed."

Aside from the foregoing evidence of influence and control, other examples of Contel's intimate relationship with Contel West include: (1) Contel negotiated or participated in negotiating identical telephone directory publishing contracts with Mast Advertising & Publishing Co., Inc. for use by each of Contel's telephone operating company subsidiaries;[18] (2) Contel has authority to approve the rates charged by its subsidiaries for telephone subscriber listings; and, (3) Contel West has used the Contel logo. Another wholly-owned Contel subsidiary, Contel Service Corporation, has provided significant accounting and bookkeeping services to Contel West.[19] In addition, Contel West is included on the consolidated federal income tax returns of Contel. *See* Contel Corporation's Appendix of Exhibits, Exhibit L, *Contel of the West, Inc. Financial Statements*, at 1 (page 1 of notes).

This court concludes that the foregoing facts are adequate to establish a prima facie case that Contel's control over Contel West is sufficient to influence and control those decisions relating to Contel West's telephone directory advertising activities, including those in Utah, which are alleged by Phone Directories to have led to a violation of the antitrust laws. In reaching this conclusion, the court is mindful of the evidence adduced by Contel to the effect that other day-to-day operating decisions made by Contel West are not subject to primary control by Contel.[20] However, the court

---

**17.** Contel claims that in her deposition, Sharon Doolin testified the MAPs were "merely guidelines" that Contel West is free to rely on or disregard altogether. This court believes that Contel's interpretation of Doolin's statement is overdrawn. Rather, a reasonable interpretation of Doolin's responses is that some provisions of the MAPs leave room for interpretation. The divisional employees are free to interpret these provisions, so long as they have cleared their interpretations with their superiors in the organizational ranks of Contel. *See* Contel Corporation's Appendix of Exhibits, Exhibit G, *Deposition of Sharon Doolin*, at 128. The fact that these policies are subject to interpretation does not mean they are merely suggestions. Moreover, simply because one employee chooses not to follow company policy does not mean that it ceases to be company policy.

**18.** All of the contracts between Contel's telephone subsidiaries and Mast Advertising & Publishing Company are identical.

**19.** Contel maintains that there is no evidence that Contel provides financial assistance to Con-

tel West. *See* Contel Corporation's Reply Memorandum in Support of Motion to Dismiss, at 6, ¶ 10. Yet, one of Contel's own exhibits states that Contel West has an unsecured line of credit with Contel Capital Corporation, an affiliate of Contel West and presumably another wholly-owned subsidiary of Contel, in the amount of $10 million. *See* Contel Corporation's Appendix of Exhibits, Exhibit L, *Contel of the West, Inc. Financial Statements*, at 3 (page 3 of notes).

**20.** Contel notes that Contel West is solely responsible for its own advertising, accounting, bookkeeping services, pension management, inventory, and for selecting and paying its own legal counsel. Contel's exhibits, however, suggest that Contel West participates in Contel's pension plan. *See* Contel Corporation's Appendix of Exhibits, Exhibit L, *Contel of the West, Inc. Financial Statements*, at 7 (page 7 of notes). Similarly, whereas Contel West may ultimately select and pay its own legal counsel, Contel's MAP entitled "Handling Requests For Release of Subscriber Listings" requires that any copyright

does not view lack of day-to-day control in all areas as sufficient to overcome the evidence of significant influence and control in the areas where the antitrust laws are alleged to have been violated. This is not a situation where Contel is merely a passive investor seeking to oversee its investment. Rather, Contel is a giant, integrated telecommunications empire that uses its ownership of all of Contel West's stock to dominate at least some aspects of Contel West's business activities.

Based on the foregoing discussion, this court concludes that venue is proper in the District of Utah under § 12 of the Clayton Act, 15 U.S.C. § 22, on the grounds that Contel has transacted business here through its subsidiary Contel West. Because of this conclusion, the court finds it unnecessary to address Phone Directories' argument that venue is also proper under 28 U.S.C. § 1391.[21]

### C. *Personal Jurisdiction.*

■ Having concluded that venue is proper in this case, the next issue is whether this court has personal jurisdiction over Contel. There are two prerequisites to a United State District Court's exercise of personal jurisdiction over a defendant. First, there must be a statutory basis for asserting personal jurisdiction. *Taylor v. Phelan,* 912 F.2d 429, 430–31 (10th Cir. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 786, 112 L.Ed.2d 849 (1991); *DeMoss v. City Market, Inc.,* 762 F.Supp. 913, 916 (D.Utah 1991). Second, if jurisdiction is proper under the statute, the court must determine whether exercising jurisdiction comports with the requirements of the due process clause. *Taylor,* 912 F.2d at 430–31; *DeMoss,* 762 F.Supp. at 916.

### 1. Service of Process.

■ As the Supreme Court of the United States has made clear, "[b]efore a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of process must be satisfied." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 104, 108 S.Ct. 404, 409, 98 L.Ed.2d 415 (1987). This requires not only that the defendant be given adequate notice but, in the absence of consent, the defendant must also be made amenable to service of summons by authorization of statute. *Id.*

Federal Rule of Civil Procedure 4(e) establishes the methods for serving process on an out-of-state defendant in a federal civil case. "Under this rule, if a federal statute containing a service of process provision is applicable to the case, then service may be made in according to its terms." *Delong Equip. Co. v. Washington Mills Abrasive Co.,* 840 F.2d 843, 847 (11th Cir. 1988). In the absence of a federal statute, Rule 4(e) directs that service of process be made in accord with the law of the state where the district court sits. Fed.R.Civ.P. 4(e); *Delong Equip.,* 840 F.2d at 847.

In this case, service of process is authorized by the nationwide service of process provision at § 12 of the Clayton Act, 15 U.S.C. § 22. *See also Delong Equip.,* 840 F.2d at 848 (defining § 12 as a nationwide service of process provision). Section 12 provides that a defendant may be served "in the district of which it is an inhabitant, or wherever it may be found." Moreover, there is no claim by Contel that service was not made properly in accord with this provision and in a manner that gave adequate

infringement action with respect to Contel West's telephone subscriber listings must be "coordinated" through Contel's legal department. *See* Contel Corporation's Appendix of Exhibits, Exhibit H, *Management Administrative Procedure,* at 4.

21. The court, however, notes that both Contel and Phone Directories quote an antiquated version of § 1391 in their papers. The version cited by the parties was significantly amended in 1988 and again in 1990. *See* Judicial Improvements and Access to Justice Act, Pub.L.

No. 100–702, Title X, § 13013(a), 102 Stat. 4669 (1988); Judicial Improvements Act of 1990, Pub.L. No. 101–650, Title III, § 311, 104 Stat. 5114 (1990). This may explain why neither party argues the applicability of 28 U.S.C. § 1391(c). Section 1391(c), taken in conjunction with § 1391(b), provides for venue in an action where all defendants reside, and defines the residence of a corporate defendant as any district where the corporation is subject to the personal jurisdiction of the court.

notice of the nature and pendency of this claim. Therefore, this court must conclude that it has a sufficient statutory basis for asserting personal jurisdiction over Contel.

### 2. Due Process.

█ The second prerequisite to this court exercising jurisdiction over Contel is that such an exercise comport with the requirements of the due process clause of the Fifth Amendment.[22] The touchstone for determining whether an exercise of personal jurisdiction comports with due process is whether the defendant has certain minimum contacts with the forum such that the "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)).

Application of this test involves a two-step inquiry. First, this court must consider whether Contel has the requisite minimum contacts with the District of Utah. *DeMoss*, 762 F.Supp. at 917. *See also Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987) (articulating a two-step due process analysis); *Burger King Co. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (same). Second, if Contel has sufficient contacts with this forum, this court must determine whether asserting personal jurisdiction based on such contacts is fair and reasonable. *DeMoss*, 762 F.Supp. at 917.

#### a. *Minimum Contacts*

█ In order to find that Contel has sufficient minimum contacts with the District of Utah to be subject to the personal jurisdiction of this court, the court must determine whether Contel has performed some act or acts by which it has "purposefully avail[ed] itself of the privilege of conducting activities within the forum [district], thus invoking the benefits and privileges of its laws." *Hanson v. Denckla*,

357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). Such purposeful availment would have provided Contel with "clear notice that it is subject to suit" in the District of Utah. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

Both Phone Directories and Contel argue that the same facts that relate to whether a parent transacts business through its subsidiary for the purposes of § 12 of the Clayton Act are also relevant to determining if the parent has sufficient minimum contacts with the forum. *See Smokey's of Tulsa, Inc. v. American Honda Motor Co., Inc.*, 453 F.Supp. 1265 (E.D.Okla.1978); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 402 F.Supp. 262, 328–29 (E.D.Penn.1975). Without attempting to define the precise relationship between the transacts business requirement of § 12 and the minimum contacts requirement of the due process clause, this court concludes that Contel's activities with respect to Contel West not only support venue in the District of Utah under § 12, but also constitute ample contact with the district to support this court's exercise of personal jurisdiction. As detailed above, the record establishes that Contel has exerted significant influence on Contel West's telephone directory activities, including those in Utah. Given its actions in this regard, Contel cannot reasonably claim that it could not anticipate being haled into court in Utah to account for its actions. *See World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567.

#### b. *Reasonableness Factors*

█ Having determined that Contel has sufficient contacts with this district to support this court's exercise of personal jurisdiction, the next question compelled by the due process clause is whether such an exercise would be fair and reasonable. Specific factors include: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the

---

**22.** In an action in federal court arising under federal law, the due process clause of the Fifth Amendment guides the constitutional branch of

the jurisdictional inquiry. *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 293 (3d Cir.1985).

plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and, (5) the shared interests of the several states in furthering fundamental substantive social policies. *Asahi,* 480 U.S. at 113, 107 S.Ct. at 1033; *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184.

Contel argues that Phone Directories has failed to allege any facts to support the reasonableness of asserting jurisdiction in this case. This court disagrees and believes the record provides a sufficient basis for concluding that an exercise of jurisdiction is reasonable. With respect to the burden on the defendant of litigating in this forum, the court notes that Contel exerts significant and regular influence on the activities of Contel West, including those activities that take place in Utah. In light of this and the fact that Contel is a multi-billion dollar, international corporate entity, the court does not believe that Contel would face an unreasonable burden if it were required to litigate a matter in this district. *See generally* Plaintiff's Exhibits to Memorandum in Opposition to Defendant's Motion to Dismiss, Exhibit A, *Contel Annual Reports.*

Phone Directories, on the other hand, was allegedly injured in Utah. At least part of the relevant geographical market that Phone Directories claims Contel's has sought to monopolize is located in Utah. Also, Phone Directories is based in Utah. As this court has discussed above, Congress has determined that in allocating the burdens of litigation between plaintiffs and defendants in antitrust actions, the scale should be tilted in favor of plaintiffs. This district would provide a convenient forum for the plaintiff.

Based on the foregoing discussion, this court concludes that it has personal jurisdiction over Contel for the purposes of this action.

## CONCLUSION

For all of the reasons set forth above, this court concludes that Contel is subject to the jurisdiction of this court and venue is proper in the District of Utah.

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that:

Defendants' Motion to Dismiss is denied. This order shall suffice as the Court's ruling on this motion and no further order need be prepared by counsel.